**NIKKAL INDUSTRIES, LTD., Plaintiff,**

v.

**SALTON, INC., Defendant.**

**87 Civ. 6092 (CHT).**

United States District Court,
S.D. New York.

April 24, 1990.

See also 689 F.Supp. 187.

Ginsburg, Feldman & Bress, Chartered, Washington, D.C. (Mary Helen Sears, Jonathan Ginsburg, Beth A. Rosenbloom, of counsel), Lynch, Rowin, Burnbaum & Crystal, P.C., New York City (Marc Rowin, of counsel), for plaintiff.

Dewey, Ballentine, Bushby, Palmer & Wood, New York City (Sanford M. Litvack, Jonathan W. Miller, David A. Koenigsberg, Channah S. Broyde, of counsel), for defendant.

## OPINION

TENNEY, District Judge.

Plaintiff, Nikkal Industries, Ltd. ("Nikkal"), brings this action against defendant, Salton, Inc. ("Salton"), alleging that Salton has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), by making false claims about a home ice-cream maker sold by Salton. The case was tried to the court and the following, including those additional facts referred to in the Discussion, constitutes the court's findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

## FINDINGS OF FACT

1. Nikkal is a Delaware corporation with its principal place of business in Virginia Beach, Virginia. Since 1985, Nikkal has marketed, distributed and sold compact, hand-operated, freezer type ice-cream makers of various sizes under the name Donvier. Nikkal has sold in excess of 2,000,000 ice-cream makers, making it the largest seller and distributor of this type of ice-cream maker in the United States. Stipulated Facts 3, 5, 23, 24.

2. Salton is a New York corporation with its principal place of business in Niles, Illinois. Salton markets, distributes and sells a variety of housewares products. In April 1986, Salton introduced its own compact, hand-operated, freezer type ice-cream maker, which it named the Big Chill. Stipulated Facts 4, 6.

3. Both the Donvier and the Big Chill are non-electric ice-cream/frozen dessert makers designed for home use. They use a frozen double-walled aluminum cylinder to freeze a prepared ice-cream mixture to produce homemade ice cream and other frozen desserts. Sealed within the walls of the aluminum cylinder is a chemical coolant which, when frozen in a home freezer, provides the chilling capacity for the entire unit. Stipulated Fact 9.

4. The Big Chill is made up of five parts: an outer plastic body; a removable, sealed, aluminum, double-walled bowl, encapsulating the coolant; a flow-through dasher paddle; a hand-operated crank; and a clear plastic cover containing a filler lid, through which other ingredients, such as fruit or nuts, may be added after the mix begins to freeze. Tr. 16–19; Pl. Exh. 1.

5. Before using the Donvier or the Big Chill, the aluminum cylinder must first be frozen, since it provides the cooling capacity for the machines. When that process is complete, the cylinder is put in the outer casing, the paddle inserted, the prepared ice-cream mixture poured into the cylinder, the plastic lid closed, and the paddle turned every few minutes.

6. Salton has used four different types of double-walled cooling cylinders in the relevant time periods. The earlier models either suffered from leaks or did not perform as well as that now in use. The latest cylinder has been part of each Big Chill unit sold by Salton since January 4, 1988. Tr. 1100, 1194–95.

7. Salton has notified all customers who had purchased earlier models that the new cylinders had improved the performance of the Big Chill. Salton has offered to exchange any Big Chill ice-cream makers previously purchased for new Big Chill ice-cream makers using the new cylinder.

8. Home ice-cream makers, such as the Donvier and the Big Chill, are not precision appliances and the results obtained when using them depend upon a number of factors. These include the temperature of the freezer; the temperature of the aluminum cylinder; the presence of other items in the freezer with the cylinder; the position of the cylinder in the freezer—i.e., whether the cylinder is placed upside down or on its side in the freezer; the location of the cylinder in the freezer; the temperature of the room where the ice cream is being made; the amount of ice cream being made, the period of time the frozen cylinder has been outside the freezer before being used; the recipe and ingredients used

to make the ice cream; and the temperature of the ice-cream mixture. *See* Tr. 8–9, 14–15, 57, 79–80.

9. The ice cream produced by both the Donvier and the Big Chill is soft when first made. The user can harden the ice cream by extending the length of time the mixture is left in the aluminum cylinder or placing it in a freezer for a period of time. Both the Donvier and the Big Chill come with instructions that advise users how to harden the ice cream. Tr. 19, 62–63, 78, 84.

10. Until 1986, Nikkal was virtually the only distributor of compact, freezer-type ice-cream makers to retail department stores and had more than 95% of the market for this type of product. Because Nikkal had little or no competition, it was not subject to price competition, was able to spend less on advertising, and could dictate selling policies to customers. Tr. 556; Def. Exhs. CT, JD; *see* Tr. 286–87.

11. Beginning in the summer of 1986, Nikkal faced increasing competition from several other cylinder-type ice-cream makers, which operated on the same general principles as the Donvier. These new entrants included Nordic Ware, Rival, Italian Express Co., Philips Home Products, Presto, Progressive, Lello, Glacier Ware, Takka, Barry Helman, Mattel, M.A.S. of America and Salton. Every sale by one of these new competitors represented a lost sale by Nikkal. Tr. 236–40, 268, 275, 558–59.

12. Some of the newer ice-cream makers, including Salton's Big Chill, were significantly less expensive to the wholesaler than the corresponding Donvier model sold by Nikkal. The Big Chill's wholesale list price, for example, was $25, while the Donvier Premier Quart's wholesale list price rose to $30.

13. Salton does not sell the Big Chill directly to consumers but rather sells it to retailers, mostly large department stores. Salton promotes the Big Chill to these retailers directly, through sales representatives, and through its participation in the National Houseware Manufacturers' Show in Chicago. Salton has also placed advertisements in the trade publication *Entree*. With the exception of a one-time two-inch advertisement in the June 1987 issue of *Metropolitan Home*, Salton has not advertised the Big Chill directly to consumers.

14. As part of its marketing and sales strategy, Salton created material for use in its trade advertisements and on its packaging for the Big Chill. Each of the challenged materials contains a photograph in which a serving dish or cone of hard ice cream—of a consistency that could be obtained only if the initial soft ice cream were placed in a freezer for some time—appears beside a Big Chill unit. The material depicted as hard ice cream is, in fact, probably only a mixture of mashed potatoes and food shortening. The reason why this mixture is used, rather than real ice cream, is because the heat generated by lights needed to photograph the product makes use of actual ice cream impracticable. *See* Tr. 68.

15. Nikkal's claim that Salton violated the Lanham Act is based on several instances in which the photographs were accompanied by the following text:

a. Salton's Big Chill is the fast, fun, no fuss answer to ice cream in twenty minutes. Big Chill's 1½ quart capacity means there's enough delicious dessert for the whole family.

1½ quarts of fast, fun, no-fuss ice cream in twenty minutes. Large 1½ quart capacity.

Pl. Exh. 74 (Salton trade "sell" sheet handed out at April 1986 Housewares' show) (accompanied by photograph of "hard" ice cream).

b. Bigger! Large 1½ quart capacity to make enough ice cream for the whole gang.

Better! No electricity, No ice, No salt. And in no time at all—about 20 minutes—delicious frozen desserts. Mixed up just right with a few turns of our exclusive flow-through mixing paddle. Also, convenient handles on the chill cylinder so the only thing that freezes is the ice cream.

Pl. Exh. 122 (Big Chill trade advertisement in August 1986 *Entree* Magazine and four subsequent issues) (accompanied by photograph of "hard" ice cream).

c. 1½ quarts! Ready in 20 min.! For making superb ice cream, sherbet, frozen mousse and other desserts.

Pl. Exh. 1 (Big Chill packaging box bearing 1986 copyright date, used until August 1987) (accompanied by photograph of "hard" ice cream).

d. Fact # 3. Our machine is bigger. Again, bigger than any other on the market. Big Chill's 1½ quart capacity means more ice cream for more people. It's ready in just 20 minutes, too.

Fact # 5. It makes great ice cream.

Pl. Exh. 116 (Big Chill advertisement in June 1987 *Entree* Magazine) (accompanied by photograph of "hard" ice cream).

e. It's Bigger!

1½ quart capacity means more ice cream for more people.

Ready in 20 minutes.

It's better!

Pl. Exh. 113 (Big Chill packaging box shipped from August 1987 to at least the end of December 1987) (accompanied by photograph of "hard" ice cream).

f. Fact # 3. Our machine is bigger. Again, bigger than most others on the market. Big Chill's 1½ quart capacity means more ice cream for more people. It's ready in just 20 minutes, too.

Fact # 5. It makes great ice cream.

Pl. Exh. 136 (Big Chill advertisement in November 1987 *Entree* magazine) (accompanied by photograph of "hard" ice cream).

g. It's Cold!

It's Big and it's easy.

Big Chill, its big capacity means more ice cream for more people. No ice, salt or electricity needed....

Pl. Exh. 164 (Salton sales catalog sheet handed out at January 1988 Housewares' show) (accompanied by photograph of "hard" ice cream).

h. It's Cold!

It's Big and it's easy. Big Chill; its big capacity means more ice cream for more people. Equipped with handy features....

It's Fun! No ice, salt or electricity needed. Big Chiller Filler, one snappy, sealable opening in the see-through lid makes adding mix-ins easy.

Pl. Exh. 163 (Big Chill packaging box introduced in 1988 and still being shipped) (accompanied by photograph of "hard" ice cream).

*See* Pl. Br. at 10–13.

16. Although neither the Donvier nor the Big Chill is particularly well-suited for producing 1½ quarts of ice cream of acceptable firmness in twenty minutes, each is capable of doing so. Tr. 48–49, 79, 566–69, 1198–99, 1315–19; Pl. Exh. 130; Def. Exh. BP, ED; *see* Pl. Br. at 30.

17. Neither the Big Chill nor the Donvier is capable of producing, in twenty minutes, ice cream as hard as that depicted on the photographs used in the marketing of the Big Chill.

18. On March 31, 1986, as Salton was planning to introduce the Big Chill at the National Houseware Manufacturers' Show in Chicago, Nikkal's attorneys wrote to Salton claiming that Salton's marketing of the Big Chill infringed on patents Nikkal held on hand-held ice-cream makers. Nikkal's attorneys demanded that Salton cease marketing the Big Chill, but Salton continued to do so. Tr. 1094–95; Def. Exh. AI.

19. Nikkal then applied in the United States District Court for the Northern District of Illinois for a temporary restraining order that would have prevented Salton from marketing the Big Chill. In April 1986, after its request for the order was denied, Nikkal voluntarily discontinued that action. Tr. 1295; Pl. Exh. 235.

20. In July of 1987, in response to a request by Nordic Ware, which was then marketing a 1½ quart unit, Salton voluntarily changed a phrase in its advertisements stating that the Big Chill was "bigger than others on the market" to "bigger than most others on the market." Tr. 1211–13.

21. In August of 1986, when competition first appeared, Donald Burch, Nikkal's Vice President for Sales and Marketing, suggested that Nikkal increase national advertising, meet competitive prices, make additional funds available for cooperative

advertising programs with retailers, provide for extra payment terms to meet those of competitors, and conduct additional publicity and sales promotion activities. Def. Exh. CT.

22. Nevertheless, in February 1987, Nikkal increased the price for the Donvier Premier line from $28 to $30. This $2 price increase had a negative effect on sales. On April 28, 1987, Nikkal announced that effective July 1, 1987, it would decrease the accrual allowance for Donvier ice-cream makers from $4 per unit to $3 per unit. This meant that the stores had less money available to them for advertising and promotion, thus reducing their ability to sell ice-cream machines. At this point, Salton was pricing the Big Chill at $20 wholesale net of advertising, but Nikkal did not reduce its prices. Tr. 228, 289–91.

23. On May 29, 1987, George Friedman, one of Nikkal's representatives on the West Coast, wrote to James Kabler, Nikkal's President and Chief Operating Officer, about marketing decisions made by David Kabler, Nikkal's Executive Vice-President of Sales, stating:

> Since the first of the year, I have advised Don Burch and spoken with David Kabler several times advising them that Price Club wants to net out the demo funds. They feel that Donvier management is not responding to their requests and is very inflexible.
>
> Salton management has been most interested in getting their ice cream maker into Price Club, who purchases a tremendous amount of other Salton items. They have the entree and a terrific track record with Price Club and were waiting for us to make a mistake.
>
> Price Club informed me they were serious in considering Salton. Again I talked with David. David decided to hold his position regarding demo funds, and Price Club bought Salton not Donvier. Unfortunately their threat was not an idle one!
>
> . . . .

We have lost a lot of business unnecessarily so far this year. I think to [sic] not to respond, even at this late date, would be a big mistake.

Tr. 318; Def. Exh. DB.

24. In July 1987, Nikkal reduced its national advertising budget for the Donvier by $500,000. Tr. 303–04.

25. Nikkal's policies led to the loss of several major accounts, including Price Club in San Diego, Macy's in New York, and Bullock's in Los Angeles. *See* Tr. 306, 315–17, 322–24.

26. By 1987, the market in general for home ice-cream makers had reached its peak and demand for the Donvier, along with its competitors, started to decline. *See* Tr. 541.

27. On August 21, 1987, more than one year after Salton's advertisements began appearing, Nikkal commenced this action asserting claims for false advertising under the Lanham Act and sections 349 and 350 of the New York General Business Law, N.Y.Gen.Bus.L. §§ 349–50 (McKinney 1968 & Supp.1988), seeking monetary and injunctive relief.[1] Simultaneously with the filing of the complaint, plaintiff moved for a preliminary injunction seeking to restrain Salton from claiming, in its promotional materials: (a) that the Big Chill is bigger than all other ice-cream makers; (b) that it produces 1½ quarts of ice cream, and (c) that it produces this ice cream in twenty minutes.

28. Nikkal's primary purpose in initiating this lawsuit was to prevent Salton from being able to compete with Nikkal. Salton did not receive any request from Nikkal or its attorneys to cease making any representations prior to Nikkal's commencement of this lawsuit. Tr. 1114–15, 1186.

29. At a hearing held on September 22, 1987, before Judge Leonard B. Sand, Salton noted that it had dropped from its advertisements any claim that its machine was bigger than all others. With the consent of all counsel, that issue was deemed moot by the court. With regard to the other claims,

---

1. Nikkal has not briefed the court on the applicability of N.Y. Gen.Bus.Law §§ 349–50. There-fore, it considers the claims based on these statutes abandoned. *See* Def. Br. at 2 n. 1.

Judge Sand denied the motion for a preliminary injunction, finding that Nikkal had not demonstrated a likelihood of success on the merits or that the balance of hardships tipped in its favor.

30. In January 1988, largely as a result of the filing of this lawsuit, Salton dropped all references to 1½ quart capacity and twenty-minute preparation time from its promotional materials for the Big Chill. Tr. 1111.

31. The "scoopability" of ice cream is important in the commercial context, since many customers are served their ice cream in cones. It also helps commercial retailers control the size of portions. The hardness of the ice cream produced by machines such as the Donvier and Big Chill is not particularly important to the ultimate consumer, however. Nor is the relatively small difference in speed at which the Donvier and Big Chill operated. Tr. 76; *see id.* at 509.

32. Other factors, such as price and profit margin considerations, Nikkal's marketing decisions, the proven history of Salton's other products and different features of the competing products, were far more important than the speed, capacity and hardness of the ice cream produced. Salton's price was consistently lower than Nikkal's and its advertising and promotional allowances higher. These differences, not the claims made by Salton in its promotional materials, affected the respective market performances of Nikkal and Salton. Tr. 334, 378, 383, 393–94, 395, 399; Deposition of Richard A. Ham, sworn to December 17, 1987, at 24, 29–30, 32; Deposition of Alan G. Noraker, sworn to December 18, 1987, at 23–25, 26, 32, 29–30; Deposition of John Donaldson, sworn to December 18, 1987, at 19–21, 26; Deposition of Martin Noyola, sworn to December 18, 1987, at 18–19, 24–25, 28–29; Deposition of Joy Georges, sworn to December 18, 1987, at 21–22, 29,

32, 35; Deposition of Craig Robbins, sworn to December 17, 1987, at 53, 58; Deposition of Tracy Powell, sworn to December 18, 1987, at 18, 20 ("Powell Dep.").[2]

33. Nikkal nevertheless sought to establish at trial that Salton's advertisements caused Nikkal to lose sales of Donvier ice-cream makers and the profits from those sales. In order to calculate the amount of damages, plaintiff attempted to introduce the testimony of Dr. Blaine F. Nye, an economist who constructed a damage model to calculate the amount of revenues Nikkal allegedly lost as a result of Salton's advertising and the effect the advertising allegedly had on the market for compact freezer-type ice-cream makers.

34. For purposes of his testimony, Dr. Nye had assumed that Salton's allegedly false statements had significantly decreased Nikkal's sales. Relying on that assumption, he had calculated, by means of a linear regression model, that Nikkal was damaged in excess of $4.1 million for the time through April 1988 and that it would sustain an additional $1.7 million of future damages as a result of Salton's advertisements.

35. The court did not admit Dr. Nye's testimony, however, because his assumption did not provide for the impact of other significant factors, such as the possible effects on sales of a declining trend in the popularity of freezer-type ice-cream makers, the appearance of several competitors, vigorous price competition and, most importantly, Nikkal's poor marketing strategy.

36. Nikkal's loss of sales was a result of a general decline in popularity of freezer-type ice-cream makers, increased competition, and its own marketing policies regarding how to meet the challenge of that competition.

37. Nikkal has not proven by a preponderance of the credible evidence that it was

2. These depositions were premarked by both sides for introduction at trial, although the record does not reflect that they were ever formally offered into evidence. During the trial, each party apparently assumed that the marked portions were received in evidence, *see, e.g.*, Tr. 1040–41, and each has cited the relevant ex-

cerpts in its post-trial brief, without exception from the other side. *See, e.g.*, Pl. Br. at 52–55; Def. Br. at 20–21; Pl. Reply Br. at 54, 57 n. 44, 58–59. Therefore, rather than reopen the case to entertain a motion to have them received, the court has simply deemed the cited portions to have been admitted.

damaged by Salton's use of any of the challenged promotional materials.

## DISCUSSION

Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a) (1988), provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities ... of his or her ... goods ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

A defendant may violate section 43(a) by making any applicable statement that is literally false, or one that has a tendency to mislead or deceive. *American Home Prod. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165–66 (2d Cir.1978).

Throughout this litigation, Nikkal has challenged three facets of Salton's promotional materials for the Big Chill. It has asserted that Salton falsely represented that the Big Chill was capable of producing: (1) one and one-half quarts of (2) "scoopable" ice cream in (3) twenty minutes.[3] In its post-trial brief, Nikkal has essentially argued that by juxtaposing images of very firm ice cream next to photographs of the Big Chill, Salton has mislead buyers into believing that the Big Chill is capable of producing ice cream as "scoopable" as that depicted in the photographs. *See* Pl. Br. at 6–7; Pl. Reply Br. at 6–7. For the reasons stated below, the court finds that the Big Chill is capable of producing 1½ quarts of ice cream of acceptable firmness in twenty minutes. It also rejects Nikkal's claim that Salton has falsely represented that the Big Chill is capable of producing ice cream of similar firmness to that depicted in the relevant photographs.

### A. The Capacity and Speed of Performance of the Big Chill

▮ Both the Donvier and the Big Chill are capable of producing 1½ quarts of ice cream in more than twenty minutes. Tr. 48–49, 566–69; Def. Exh. BP, ED; *see* Pl. Br. at 30. The court heard conflicting testimony about the ability of the Big Chill to produce 1½ quarts of ice cream of acceptable firmness in twenty minutes, however. Dr. Fern Hunt, for example, who was appointed by the court to conduct independent tests on the performance of each unit, testified that the Donvier could, and the Big Chill could not, produce 1½ quarts of acceptably-firm ice cream in twenty minutes. Tr. 49, 53. James A. Baskerville, an expert called by Nikkal, also stated that the Big Chill was incapable of turning out an acceptable product in this little time. Tr. 146. Barbara Westfield, a Salton employee, however, testified that the Big Chill was capable of producing 1½ quarts in twenty minutes. Tr. 1198–99. Dr. Arun Kilara, an expert called on behalf of defendant, also testified that the Big Chill was capable of producing 1½ quarts in twenty minutes. Tr. 1319.

The difficulty in deciding whether Salton's claims about the performance of the Big Chill at this capacity were true is that there is no basis, other than a subjective one, upon which to determine how firm ice cream must be to be considered "acceptable." Dr. Hunt, who testified that the Big Chill could not perform adequately at this speed and capacity, recognized this herself. She was careful to point out that the test she had used to determine what was an "acceptable" level of firmness was a "scoopability" standard she created, Tr. 11–12, 65, 72, which had never been applied to homemade ice cream, Tr. 75. She also stated that it was not based upon any generally accepted standards for determining the

---

**3.** Nikkal no longer appears to challenge Salton's claim that the Big Chill was "better" than its competitors. Such statements constitute mere "puffing," and are not actionable as false advertising. *See Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310–11 (2d Cir.1972); *Brignoli v. Balch Hardy & Scheinman, Inc.*, 645 F.Supp. 1201, 1209 (S.D.N.Y.1986).

quality of ice cream, Tr. 35, 73; *see id.* at 54–55.

Although Dr. Hunt was an "independent" expert, her opinion was essentially based on her own subjective ideas about the nature of scoopable ice cream, Tr. 14, 65–66, and she admitted that reasonable persons could differ with her evaluation of what was acceptable, Tr. 53, 74. Dr. Kilara, although retained by Salton, was nevertheless a professor with some experience in matters of ice cream. He was quite firm in his opinion that the Big Chill was capable of producing 1½ quarts of acceptable ice cream in twenty minutes. Since there was a difference of opinion between the competing experts, it is reasonable to infer that at least some percentage of the buying public would be satisfied with the firmness of 1½ quarts of ice cream produced by the Big Chill in twenty minutes.[4] This means that Salton's claim that the Big Chill was capable of producing 1½ quarts of ice cream in twenty minutes was true. The evidence suggests that the Donvier was a slightly better performer, *see* Tr. 101, 113, 115, 133 (test results indicating that Donvier able to cool to lower temperature more rapidly than Big Chill), but this was an advantage that Nikkal could have exploited through its advertising; it did not make Salton's claims about the Big Chill false.

B. *The Use of Photographs of "Hard" Ice Cream*

Nikkal's other argument centers on its claim that Salton falsely represented that the Big Chill is capable of producing ice cream as firm as that depicted in the relevant photographs. As with the previous claim, however, the court finds that Nikkal has not met its burden of proving that Salton's actions violated the Lanham Act.

■ There is no statement in any of the promotional materials that explicitly describes the ability of the Big Chill to produce ice cream as "scoopable" as that depicted in the photographs. At best, the juxtaposition of the Big Chill unit alongside the photographs of "hard" ice cream could be characterized as being potentially misleading. In determining whether a statement is misleading, the court must first consider its literal meaning, then determine whether it conveys to the particular audience at which it was directed any implied message beyond its literal meaning. *Avis Rent A Car System, Inc. v. Hertz Corp.,* 782 F.2d 381, 385–86 (2d Cir.1986); *American Home Prod.,* 577 F.2d at 165. Once the meaning to the target audience has been determined, the court, as the finder of fact, must then judge whether the evidence establishes that they were likely to be misled. *McNeilab, Inc. v. American Home Prod. Corp.,* 501 F.Supp. 517, 525 (S.D.N.Y.1980). "[P]laintiff bears the burden of showing that the challenged statement is false and misleading, not merely that it is unsubstantiated by acceptable tests or other proof." *Procter & Gamble Co. v. Chesebrough–Ponds, Inc.,* 747 F.2d 114, 119 (2d Cir.1984) (citation omitted).

■ The fact that a photograph of hard ice cream appears in the challenged materials does not necessarily mean that Salton's customers formed the impression that the Big Chill was capable of producing ice cream of such firmness. *See Federal Trade Comm'n v. Sterling Drug, Inc.,* 317 F.2d 669, 676–77 (2d Cir.1963). Unless the suspect message is literal or direct, or where the conduct at issue is "egregious," *see PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 272 (2d Cir.1987), evidence must be presented of how an ambiguous message is understood by the intended audience. *American Home Prod. Corp.,* 577 F.2d at 165–66; *American Brands, Inc. v. R.J. Reynolds Tobacco Co.,* 413 F.Supp. 1352, 1356–57 (S.D.N.Y.1976). *But cf. Federal Trade Comm'n v. Colgate–Palmolive Co.,* 380 U.S. 374, 391–92, 85 S.Ct. 1035, 1046, 13 L.Ed.2d 904 (1965) (Federal Trade Commission not required to conduct survey of television viewers to determine whether commercial tended to mislead because, if Commission finds deception, it is entitled to

---

**4.** The court notes that there was no evidence presented that the buying public was dissatisfied with the performance of the Big Chill. *See, e.g.,* Tr. 381, 398, 1158.

infer that the deception will constitute a material factor in a purchaser's decision to buy).

> When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public. When the challenged advertisement is implicitly rather than explicitly false, its tendency to violate the Lanham Act by misleading, confusing or deceiving should be tested by public reaction.

*Coca–Cola Co. v. Tropicana Prod., Inc.*, 690 F.2d 312, 317 (2d Cir.1982) (citations omitted). Therefore, to prevail on this aspect of its claim, Nikkal was required to demonstrate that the challenged materials had a tendency to deceive, or that they actually deceived, a substantial segment of Salton's intended audience. *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771, 773 (2d Cir.1984); *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 79 (2d Cir. 1981); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980).

■ In this case, Salton's advertisements were directed at a specific audience, the buyers for retail stores. Accordingly, the reactions of that audience, rather than the general public, would be determinative in gauging whether the message in the advertisements was deceptive. 1A *Callmann Unfair Competition* ¶ 5.15 at 90 (4th ed. 1981). As noted above, the Big Chill and the Donvier were of very similar design. Since the Donvier was already established in the marketplace, and its buyers were presumably familiar with its performance, it is extremely unlikely that they were mislead into believing that the Big Chill was capable of producing "hard" ice cream, simply because a photograph of such ice cream appeared in its advertising.

In addition, the evidence established that none of the buyers was mislead by use of the photographs. Indeed, most of the retail buyers called by plaintiff were not even asked about pictures of ice cream or Salton's packaging, but the testimony of the few that were establishes that they were not mislead. Tracy Powell knew that the Big Chill did not make hard ice cream. Powell Dep. 36–37, 48. Lawrence Hurd expected the ice cream to be soft, Tr. 374. Jit Renjen expected the ice cream to be as soft as that produced by the Donvier, *id.* at 393, not the kind of ice cream pictured in the advertisements and packaging at issue. Renjen also testified that the "scoopability" of the ice cream was not a factor in his decision to purchase the Big Chill. *Id.* at 393–94. As noted in the findings of fact, none of the other buyers called by plaintiff testified that they relied on the "scoopability" of ice cream produced by the Big Chill in deciding whether to order the unit. Accordingly, Nikkal failed to carry its burden of demonstrating that the audience of retail store buyers was deceived.[5] *Lambda Elec. Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 928 (S.D.N.Y.1981); *Glenn v. Advertising Publications, Inc.*, 251 F.Supp. 889, 904 (S.D.N.Y.1966).

Plaintiff claims that it should nonetheless prevail under *Coca–Cola Co. v. Tropicana Prod., Inc.*, 690 F.2d 312 (2d Cir.1982). The advertising in that case, however, was much more suggestive than the mere use of the photographs in this case. In it, a celebrity spokesperson told the television audience, while squeezing an orange, that Tropicana orange juice was "pure, pasteurized juice as it comes from the orange." *Id.* at 314. He then poured the fresh-squeezed juice into a Tropicana carton while an announcer stated that Tropicana was "the only leading brand not made with concentrate and water." *Id.* As the court stated: "[I]f seeing something

---

**5.** The use of photographs of "hard" ice cream on the packaging for the Big Chill was arguably directed at the ultimate consumer, but Nikkal did not sustain its burden of proving that they were mislead by the photographs either. Nikkal unsuccessfully attempted to introduce a survey of ultimate consumers, which had been conducted by the Roper Organization. In its offer of proof, however, Nikkal did not indicate any effort by Roper to assess the impact of the photographs. *See* Tr. 718–24. Therefore, even if the survey had been admitted, Nikkal would still not have had any proof that ultimate consumers were mislead by Salton's promotional materials.

on TV has a tendency to persuade a viewer to believe, how much greater is the impact on a viewer's credulity when he both sees and hears a message at the same time?" *Id.* In this case, there was no accompanying message that adverted to the potential firmness of the ice cream produced by the Big Chill. While the most important virtue of a frozen orange juice may be the similarity between it and fresh-squeezed, nothing in the record suggests that the "firmness" of ice cream produced by hand-operated ice-cream makers has anywhere near such importance to the buying public. Accordingly, Nikkal cannot rely on the *Coca–Cola* case to cure its failure of proof.

Similarly, Nikkal's reliance on this court's decision in *CBS, Inc. v. Springboard Int'l Records,* 429 F.Supp. 563 (S.D. N.Y.1976), does not compel a different result. In that case, a record company had packaged previous recordings of then-successful artists, and then conspicuously omitted statements regarding the year of the recording. The court found that, by doing so, the defendant had mislead customers into thinking that the suspect records were, in fact, recently recorded. The court also found that customers, confronted with the albums presented to the court, would very likely think that they were purchasing recently-recorded songs. *Id.* at 567. In this case, the court does not make any such determination. There was no other similar product capable of making ice cream as "hard" as that depicted on the boxes. Had there been, then the use of the photographs might have deserved closer scrutiny. Since there was not, it is unlikely that a consumer would have perceived the presence of the photograph as an affirmative representation that an "inferior" Big Chill was comparable in performance to some other "superior" product on the market. Since there is no evidence on the point, it is impossible to rule out the possibility that the buying public has always believed that hand-operated machines produce soft ice cream.

The use of "hard" ice cream in this case more closely resembles a hypothetical television commercial described in *Federal Trade Comm'n v. Colgate–Palmolive Co.,* 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), in which the Court envisioned actors eating ice cream that was, in fact, mashed potatoes. The Court noted that the mere fact that actors were seen eating mashed potatoes, which the consumer was led to believe was ice cream, would not be enough to constitute deceptive advertising without some other affirmative representation concerning its texture. As it stated: "If in the ice cream hypothetical the focus of the commercial becomes the undisclosed potato prop and the viewer is invited, explicitly or by implication, to see for himself the truth of the claims about the ice cream's rich texture and full color, and perhaps compare it to a 'rival product,'" *id.* at 393, 85 S.Ct. at 1047, then, the Court concluded, it might be deceptive. As it explained:

> In commercials where the emphasis is on the seller's word, and not on the viewer's own perception, the respondents need not fear that an undisclosed use of props is prohibited.... On the other hand, when the commercial not only makes a claim, *but also invites the viewer to rely on his own perception for demonstrative proof of the claim,* the respondents will be aware that the use of undisclosed props in strategic places might be a material deception.

*Id.* (emphasis added).

In this case, Salton simply used a photograph depicting hard ice cream on a point-of-purchase box without any accompanying claim that the Big Chill was capable of making ice cream firmer than that produced by other ice-cream makers. Therefore, as the discussion in *Colgate–Palmolive* makes clear, the mere presence of the photograph, without an accompanying statement relating to "scoopability," is not sufficient to constitute a violation of the Lanham Act.

### C. *The Absence of Proof of Causation*

■ Regardless of whether the challenged messages were deceptive, the testimony established that Nikkal's own marketing strategy played the predominant role in the decline of sales of the Donvier. Despite the increased competition from

**1238**

companies such as Salton, Nikkal pursued a strategy that did not adequately meet the challenge of the increasingly crowded market. Nikkal did not implement the plans proposed by its own sales staff to lower the price of the unit and increase funds for demonstrations and advertising. Tr. 289, 355–56, 361–62; Def. Exhs. CT, CR, CS. Instead, it raised the wholesale price of a unit from $26 to $28 and then to $30. Tr. 286–93; Def. Exhs. AM, AN, AO. It also decreased the demonstration allowances for its retailers from $3 per unit to $4 and cut its national advertising budget. Tr. 304; Def. Exhs. CZ, DF.

Plaintiff was never able to eliminate these factors as possible causes of the decline in Nikkal's sales. For example, after Price Club, a major merchandiser, complained about the impact of the price increases, and unsuccessfully sought a better price, it dropped the Donvier. Def. Exh. DB. Bullock's, a department store in Los Angeles, cancelled its order for similar reasons. Tr. 319–22, 545–46; Def. Exhs. DT, DZ. Plaintiff argues, nevertheless, that [u]nder *Johnson & Johnson v. Carter–Wallace* [*Inc.*, 631 F.2d 186 (2d Cir. 1980)], it is immaterial ... that other factors may have overshadowed false advertising as causes of financial loss suffered by the plaintiff. For that *very same* reason, it would not affect the propriety of entering an injunction, *even if* true, that Nikkal's marketing strategy somehow contributed to its sales decrease....

Pl. Reply Br. at 20 (emphasis in original). Putting aside the question of whether this would be the proper analysis for granting final injunctive relief, plaintiff would still have the burden of establishing, by a preponderance of the evidence, that Salton's alleged wrongdoing caused it to sustain *some* damage. For the reasons stated above, the court finds that Nikkal has failed to do so.

Since Nikkal has failed to establish a violation of the Lanham Act or any resultant damages, the court need not consider whether the equitable defense of "unclean hands" applies to this ice-cream case.

Nevertheless, it notes that on the box for its own product, the Donvier Premier quart ice-cream maker, Nikkal prominently features three different photographs of "hard" ice cream, while stating on another part of the box: "1. Freeze the Donvier cylinder in a freezer at least 7 hours. 2. Pour in the mixed ingredients. 3. Immediately turn the handle 4 or 5 times. 4. Turn it occasionally for 20 minutes. Then enjoy!" Def. Exh. AW. Salton claims that if its actions violated the Lanham Act, then Nikkal's actions must necessarily have as well.

Nikkal did not present any testimony about the use of "hard" ice cream on its packaging, but Salton's expert, Dr. Kilara, testified that it was the consistency of "hard frozen ice cream, freshly made ice cream that has been cooled further by placing in a freezer for lower temperatures." Tr. 1320–21. In fact, the ice cream depicted on the Donvier box was, like that on the Big Chill box, probably just mashed potatoes or vegetable shortening. Tr. 68; *see id.* at 1055. Since Donvier appears to have engaged in the very same conduct it has challenged, the court would have been hard pressed to grant it any equitable relief, even if the conduct of Salton had violated the Lanham Act. *See Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866, 874 (E.D.N.Y.1978); *Plough, Inc. v. Johnson & Johnson Baby Prod. Co.*, 532 F.Supp. 714, 716 (D.Del.1982); *Häagen–Dazs, Inc. v. Frusen Glädjé Ltd.*, 493 F.Supp. 73, 76 (S.D.N.Y.1980).

## CONCLUSION

The many arguments Nikkal advances to prove the superiority of its product over the Big Chill do not alter the fact that Salton never once claimed that the Big Chill was capable of making ice cream that was more "scoopable" than others on the market. The evidence suggests that the Donvier might be a better performer than the Big Chill, but Nikkal's arguments on this point should have been made in advertisements, not a court of law. While its position may have been correct, this does not affect the outcome of the case, for the

court's only task is to determine whether Salton used deceptive advertising to promote its own product. Since it did not, Nikkal's complaint against Salton is dismissed.

Salton requested consideration of its counterclaims only in the event the court found it liable on Nikkal's claims. Therefore, its counterclaims against Nikkal are dismissed and its motion for sanctions pursuant to Fed.R.Civ.P. 11 is denied.

So ordered.