**PFIZER, INC., Plaintiff and Counterclaim Defendant,**

v.

**MILES, INC., Defendant and Counterclaim Plaintiff.**

**Civ. No. 3:93CV2023 (AVC).**

United States District Court, D. Connecticut.

Aug. 19, 1994.

**440**

Ira B. Grudberg, David L. Belt, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, Joel E. Hoffman, Robert W. Clark, B. Brett Heavner, Sutherland Asbill & Brennan, Washington, DC, Patricia A. Gorham, Sutherland, Asbill & Brennan, Atlanta, GA, Michael J. Levin, Roger Boyle, Blair C. Fensterstock, Daniel F. Markham, Sutherland, Asbill & Brennan, New York City, for Pfizer, Inc.

Stefan Richard Underhill, James F. Stapleton, Day, Berry & Howard, Stamford, CT, Daniel Marcus, Thomas P. Olson, Susan P. Crawford, Lynn Charytan, Katherine Bradley, Kinsey S. Reagan, Michael L. Burack, Wilmer, Cutler & Pickering, Washington, DC, Stephanie A. Watkins, Day, Berry & Howard, Hartford, CT, for Miles, Inc.

### RULING ON PLAINTIFF'S AND COUNTERCLAIM PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION

COVELLO, District Judge.

This is an action for damages and for preliminary injunctive relief brought pursuant to § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Connecticut Unfair Trade Practices Act, ("CUTPA"), Conn.Gen.Stat. § 42–110b; the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1); the Medicaid anti-kickback statute, 42 U.S.C. § 1320a–7b(b)(2), and common law in which the plaintiff, Pfizer, Inc., ("Pfizer") seeks to enjoin the defendant, Miles, Inc., ("Miles") from engaging in an allegedly false and misleading promotional campaign that purports to equate the Miles' product "Adalat CC" with Pfizer's product "Procardia XL."

Pfizer further seeks to enjoin Miles from engaging in an alleged kickback scheme of offering payments to pharmacists for certain "cognitive counseling services" in connection with new Adalat CC prescriptions. Although Miles has withdrawn the payment program by agreement with several states, including the state of Connecticut, Pfizer nevertheless seeks preliminary injunctive relief for fear of future program recurrence. In addition, Pfizer seeks the recall of existing Miles advertisements relating to the Miles product Adalat CC; corrective advertisements; court action compliance certificates from Miles' marketing employees; a twelve month cease and desist order precluding Miles from promoting Adalat CC beyond the findings of this court; a demand that Miles cancel all outstanding orders for Adalat CC received as a result of the promotional campaign; a cease and desist order pertaining to Miles' alleged kickback activities; treble damages; punitive damages; Miles' profits from the sale of Adalat CC; pre-judgment interest, costs and attorney fees.

By way of counterclaim, Miles seeks preliminary injunctive relief to enjoin Pfizer from disseminating allegedly false and misleading information concerning the Miles' product, Adalat CC. Further, Miles moves for an order requiring Pfizer to recall existing false material relating to the Miles prod-

uct, Adalat CC; corrective advertisements; certification from Pfizer that they have held training sessions with Pfizer representatives to correct promotional activities; a twelve month order requiring Pfizer to cease dissemination of any advertising designed to compare Procardia XL, a similar Pfizer product, with Adalat CC; treble damages; profits from the allegedly false promotional campaign; pre-judgment interest, costs, and attorney fees.

The issues now presented are: 1) whether Pfizer is likely to succeed on the merits of its claim that Miles' promotional campaign is false and misleading; 2) whether in view of Miles' agreements, preliminary injunctive relief is necessary with respect to the Pharmacy Information Program; and 3) whether Miles is likely to succeed on the merits of its claim that Pfizer is disseminating into the market literally false information concerning the Miles product Adalat CC.

For the reasons hereinafter set forth, the court denies Pfizer's request for a temporary injunction and grants in part Miles' request for a temporary injunction.

### Jurisdiction and Venue

This action arises pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and pursuant to CUTPA, Conn.Gen.Stat. §§ 42–110a–q. This court has jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338, and over the Connecticut law claims pursuant to 28 U.S.C. §§ 1338 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(a).

### Facts

Documents submitted to the court disclose the following undisputed facts. Nifedipine is a "calcium channel blocker" that can be used to treat hypertension (high blood pressure). Both Pfizer and Miles have for several years marketed immediate-release nifedipine tablets, which have to be taken three times a day. In 1989, Pfizer obtained Food and Drug Administration ("FDA") approval for Procardia XL, an extended release version of nifedipine for 24 hour treatment of both hypertension and angina (pain associated with oxygen deprivation to the heart muscle). Procardia XL is delivered into a patient's blood stream through a special mechanism contained in the tablet called the gastrointestinal therapeutic system ("GITS"). GITS is a water osmosis system that enables the drug to pass into the patients blood stream at a relatively steady, constant rate over a 24 hour period.

In 1993, Miles secured FDA approval of a 24 hour, extended release nifedipine product for treatment of hypertension (but not angina), bearing the name Adalat CC, and having an average wholesale price 25% below that of Procardia XL. Once ingested, Adalat CC is delivered into a patient's blood stream through a special system called "Coat Core." Unlike GITS, Coat Core is not a water osmosis delivery system, but instead depends upon disintegration by gastrointestinal acid which leads to differing rates of drug absorption into a patient's blood plasma. Therefore, although the two drugs are similar in that both contain the same active ingredient nifedipine, and both are FDA approved for treatment of hypertension over a 24 hour period, the two differ in the rate and level of the release of the active ingredient into the patient's bloodstream over a 24 hour period. The differing concentrations of the active ingredient implicate differing pharmacokinetic profiles of the two drugs, which preclude the FDA from labeling the two drugs as "bioequivalent."[1] Since Adalat CC is not the "bioequivalent" of Procardia XL, it may not be dispensed by a pharmacist as a literal substitute for Procardia XL without a physician's prescription.

### Applicable Law

#### I. The Lanham Act.

The Lanham Act, § 43(a), as amended, 15 U.S.C. § 1125(a) prohibits the use of any

---

1. "Bioequivalence" is a term used by the FDA to indicate that two drugs with the same active ingredient have essentially the same rate and extent of absorption into the bloodstream. *Approved Drug Products with Therapeutic Equivalence Evaluations.* ("The Orange Book" 13th Ed., January 1993).

**442**

false or misleading representation on or in conjunction with goods in commerce:[2]

> Any person who, or in conjunction with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any . . . false or misleading representation of fact, which . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■ The plaintiff is entitled to prevail on the merits of its § 43(a) claim against the defendant if it establishes either of two propositions; i.e., that the defendant's promotional campaign "is either literally false, or although literally true, is likely to mislead and confuse consumers." *McNeil—P.C.C., Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991).

### 1. Misleading Claims

■ The statute embraces false impressions, innuendo and ambiguous suggestions. *See Johnson & Johnson v. GAC Int'l*, 862 F.2d 975 (2d Cir.1988); *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272 (2d Cir. 1981). When such a representation is literally true, a plaintiff has the burden of proving that the persons to whom the advertising or promotion is addressed would receive a false impression about a product. *United States Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir.1990). To show this, the plaintiff must demonstrate, by a preponderance of the evidence, that the defendant's representations are *likely* to confuse consumers. Demonstrating actual confusion is not necessary. *McNeil–P.C.C., v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991).

### 2. Literally False Claims

■ "When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisements' impact on the buying public." *Coca Cola Co., v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982). Relief can be granted without reference to the reaction of consumers. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 272 (2d Cir.1987).

## II. CUTPA

■ A violation of the Lanham Act is a *per se* violation of CUTPA, Conn.Gen.Stat. § 42–110b. "To the extent defendants' actions violated the Lanham Act, . . . they should be held automatically to violate CUTPA." *Dial Corp. v. Manghnani Inv. Corp.*, 659 F.Supp. 1230, 1239 (D.Conn.1987).

### Standard

■ The general standard for issuance of a preliminary injunction in the Second Circuit is well established. A party seeking a preliminary injunction must demonstrate: (a) irreparable harm; and (b) either (i) a likelihood of success on the merits of the underlying claim; or (ii) sufficiently serious questions going to the merits of the claim so as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant. *Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm'n*, 790 F.Supp. 1197, 1208 (D.Conn. 1992).

■ The first element, irreparable harm, may be presumed once a Lanham Act plaintiff has demonstrated that the defendant has made false and misleading comparisons of its product to that of the plaintiff-competitor. "A *misleading comparison* to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *McNeilab Inc., v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir.1988) (emphasis added). Irreparable harm may also be presumed where a plaintiff

---

**2.** Neither party disputes that the allegedly false and misleading representations were made in the realm of interstate commerce.

demonstrates a likelihood of success in showing *literally false* a comparative advertisement that mentions the plaintiff's product by name. *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992) (emphasis added.)

Once the Lanham Act plaintiff then establishes either one of the two remaining elements, the plaintiff is entitled to preliminary injunctive relief against the violation. *See Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57 (2d Cir.1992) (affirming issuance of a preliminary injunction under § 43(a)); *Chauvin Int'l Ltd. v. Goldwitz,* 832 F.Supp. 35 (D.Conn.1993) (granting preliminary injunction under § 43(a), CUTPA and other statutes). This specifically includes cases in which, as here, a pharmaceutical manufacturer seeks preliminary Lanham Act relief against false and misleading comparative promotional claims by a direct competitor. *McNeilab,* 848 F.2d at 38 (2d Cir.1988).

### Discussion

Pfizer argues that Miles' promotional materials and advertisements purport to advertise the Miles' drug, Adalat CC, as the less expensive "equivalent" to the Pfizer drug Procardia XL. Pfizer asserts that the two drugs are different, that they are therefore, not "equal", and thus the promotional material that purports to equate them is misleading and violates the Lanham Act.

Pfizer further argues that Miles' characterization of Adalat CC as "less expensive" is misleading, as well as Miles' claim that the reduced cost of Adalat CC may lead to improved patient compliance.

## A. MILES' ALLEGED FALSE AND MISLEADING PROMOTIONAL CAMPAIGN

### I

1. *Similarities, Differences, and Equivalence*

█ It is undisputed that Adalat CC and Procardia XL are similar in the following respects. 1) Both contain the same active ingredient nifedipine; 2) both are calcium channel blockers; 3) both are FDA approved for 24 hour treatment of hypertension; 4) both are orally administered; and 5) both are available in 30, 60, 90 mg strengths. However, Pfizer alleges that certain differences in the two drugs make them unequal, and therefore any actual or implied statement by Miles of equality is misleading.

The "undisputed differences" between the two drugs include the fact that the two have differing therapeutic indications, differing pharmacokinetics, differing recommendations for drug administration, differing FDA approved maximum doses, and differing dosage strength equivalence.

Differing therapeutic indications means that Procardia XL is approved for treatment of hypertension and angina, while Adalat CC is only approved for the treatment of hypertension. Differing pharmacokinetics means the two offer different rates of delivery of nifedipine into the blood over a 24 hour period. As noted earlier, drugs with differing pharmacokinetics are not considered "bioequivalent" by the FDA. Differing recommendations for drug administration means that Adalat CC should be taken on an empty stomach, while Procardia XL may be taken on either a full or empty stomach. Differing FDA approved maximum dosages means Procardia XL is approved for a higher maximum dosage than Adalat CC. Differing dosage strength equivalence means that lower dose Adalat CC tablets may not be combined to achieve dose strength equivalence with a higher dose of Adalat CC, while this is possible with Procardia XL.

The "disputed differences" between the two drugs pertain to each drug's allegedly different therapeutic effects and side effect profiles. Pfizer argues the therapeutic effects are different because it believes that Procardia XL offers a greater reduction in blood pressure than Adalat CC. Pfizer also argues that Adalat CC's side effect profile is different and more pronounced than Procardia XL's because of Adalat CC's different pharmacokinetic properties.

### a). Undisputed Differences

Pfizer argues that with the exception of price, Miles does not state the undisputed differences between the two drugs in its pro-

motional material (including advertisements). Miles' failure to state these differences, according to Pfizer, constitutes an implied equivalence between the two which is unjustified because the two are not equal. In all, Pfizer complains about six of Miles' printed promotional materials. These items include one advertisement, a press kit, and four promotional letters: Miles' 6/16/93 letter to pharmacists, 6/21/93 letter to pharmacists, 6/23/93 letter to formulary[3] committee members, and a 8/2/93 letter to physicians.

Miles' promotional material was directed at pharmacists and physicians. "[A] target audiences' special knowledge of a class of products is highly relevant to any claim that it was misled by an advertisement for such a product." *Sandoz Pharmaceutical Corp., v. Richardson—Vicks, Inc.*, 902 F.2d 222, 229–30 (3d Cir.1990). *See also Plough, Inc. v. Johnson & Johnson Baby Products*, 532 F.Supp. 714, 717 (D.Del.1982).

i). The Promotional Letters

Miles' June 21, 1993 letter to pharmacists, June 23, 1993 letter to formularies, and August 2, 1993 letter to physicians all state: "Not indicated for angina. Take on an empty stomach. Careful titration may be necessary when switching between Procardia XL and Adalat CC." In addition, each mailing, including the June 16, 1993 letter to pharmacists, was accompanied by a complete package insert required by the FDA. This insert, in Pfizer's own words, "disclose that Procardia XL and Adalat CC are not bioequivalent."[4] Although the package insert does not reference Procardia XL, it states, with regard to maximum dosage, that "titration to doses above 90 mg daily is not recommended." In regards to dose strength equivalence, the insert states that "three 30 mg tablets should therefore not be considered interchangeable with a 90 mg tablet." With deference to therapeutic indications, the insert says "Adalat CC is indicated for the treatment of hypertension." Nothing is said

about angina. Finally, the insert indicates that Adalat CC should be taken under "fasting conditions," i.e., on an empty stomach.

ii). Adalat CC Print Advertisement

The Adalat CC advertisement directed to physicians states that Adalat CC is "[n]ot indicated for angina. Take on an empty stomach. Careful titration may be necessary when switching between Procardia XL and Adalat CC." The "Brief Summary" on the back of the advertisement gives additional information normally found in the package insert, including "Adalat CC is indicated for the treatment of hypertension . . . titration to doses above 90 mg daily is not recommended," and the advertisement expressly states, "Consult Package Insert For Full Prescribing Information."

iii). Miles' Press Kit

Miles' press kit not only attaches the Adalat CC package insert discussed above, but also states, "For hypertension patients who can take nifedipine . . . [i]t should be taken on an empty stomach, and careful titration may be necessary when switching a patient to Adalat CC."

Therefore, with due consideration to the target audiences' special knowledge of this class of products, the court finds that Miles' has not failed to state in its promotional material and advertisements the undisputed differences between Adalat CC and Procardia XL. Pfizer therefore cannot establish that Miles has implicitly equated the two products with respect to the undisputed differences.

b). The Disputed Differences

i). Therapeutics

Miles advertises Adalat CC as either "providing the benefits of a once daily nifedipine for sustained reduction of both systolic and diastolic blood pressure over a 24 hour peri-

---

**3.** Formulary committee members at hospitals and (where permitted) HMO's are responsible for selecting the prescription drugs to be included on the institutions "drug formulary." A drug formulary specifies the only drugs that the institution will use to treat its patients.

**4.** Plaintiff's Memorandum In Support of Preliminary Injunction, 10/21/93 at 7.

od", or as "offering the efficiency and tolerability of extended release nifedipine [for the treatment of hypertension] at a price (AWP) 25% below the average wholesale price of Procardia XL." Pfizer argues that since Procardia XL is the only pre-existing, once daily nifedipine for the treatment of hypertension, the reference in Miles' advertisement refers to Procardia XL. And, through this reference, Miles' has implicitly equated its product, Adalat CC, with Pfizer's product, Procardia XL.

Pfizer argues that the implied reference is misleading because Adalat CC is not "bioequivalent" to Procardia XL. Since the two are not bioequivalent, Pfizer asserts the two are not therapeutically "equal" for the treatment of hypertension. Therefore, the implied comparison is misleading.

Miles responds that although the two are not bioequivalent, they can still be considered therapeutically substitutable[5] because both drugs are FDA approved as once daily, extended release versions of nifedipine for the treatment of hypertension. Therefore, even if Miles' promotional material implicitly equates the two, the promotional material is not misleading.

Pfizer's assertion that the two are not therapeutically equivalent for the treatment of hypertension rests primarily upon inferences drawn from Miles' "switch study." In this study, Miles tested Adalat CC and Procardia XL head to head. Pfizer argues that the study's results reveal the two are not therapeutically equivalent because some patients who took Procardia XL experienced a significantly greater reduction in systolic blood pressure than those taking Adalat CC. However, no definitive conclusions can be drawn from this study.

The study suffers two major flaws. First, the study was conducted in order to address concerns over the possible safety consequences of patients who incorrectly take Adalat CC after eating. Thus, patients were dosed in contravention to the FDA approved label for Adalat CC which expressly states that patients must take the drug before eating, i.e., in a "fasting" state. Whether or not a patient eats before dosing with Adalat CC is important because if there is food in a patient's stomach, the drug may be absorbed more rapidly into the patient's blood stream, leaving less of the active ingredient at the end of the treatment interval. The blood pressure measurements which Pfizer bases its claim of improved reduction in blood pressure were taken at the "trough", or at the end of the 24 hour treatment interval.

Second, approximately one third of the patient pool not only had their blood pressure measured at the trough, but as well had blood pressure measurements taken several times an hour throughout the 24 hour treatment interval. These blood pressure measurements were then averaged. The results, when viewed in the context of a full 24 hour period, point to no clinically significant difference between the blood pressure reduction achieved by Adalat CC and that achieved by Procardia XL.

The court further finds that Pfizer's own advertisement for Procardia XL purports to compare two drugs which are not bioequivalent as "basically the same."[6]

ii). Side Effects

Pfizer argues that Adalat CC's different pharmacokinetic profile results in increased side effects compared to Procardia XL. Miles responds that both drugs produce the same type and incidence of side effects.

5. *The Merck Manual of Diagnosis and Therapy* explains "therapeutic equivalence" as "2 drug products that, when administered in the same individual in the same dosage regimen, provide essentially the same therapeutic effect or toxicity; they may or may not be bioequivalent." (276:2606, 16th Edition, 1992). As an example, in California the Medicaid system no longer uses the ulcer medication Zantac due to its high cost; the use of other ulcer drugs, such as Tagamet, is encouraged. Zantac and Tagamet are not bioe-

quivalent, in fact they are not even the same chemical compound.

6. Procardia XL advertisement in the New York Times states, "It's new Procardia XL (nifedipine). *It's basically the same* Procardia you've been taking, but the XL makes it different and may save·you money." The New York Times Magazine, Sunday, Feb. 4, 1990, p. 13A (emphasis added) (Reggio Dep. Exh. 2; Dawes Dep. Exh. 3).

The court finds that in the only directly comparative study performed of the two drugs, i.e., "the switch study;" the results reveal a higher incidence of "dizziness" among those treated with Adalat CC than those treated with Procardia XL. However, because it is possible that the higher incidence of dizziness can be correlated to the fact that patients took Adalat CC after eating, as opposed to a fasting state, no definitive conclusions as to the frequency of dizziness may be drawn. The court therefore finds that Miles' has not misleadingly equated Adalat CC with Procardia XL with respect to the disputed differences.

### 2. *Less Expensive*

■■■ Pfizer next argues that Miles' promotional material is misleading because it compares the cost of Adalat CC with that of Procardia XL, and states that Adalat CC will reduce the cost of treating hypertension. Pfizer asserts that Miles' comparison is misleading because: 1) the two are not bioequivalent, and therefore, it is possible that a patient may require a higher dose of Adalat CC, at a correspondingly higher cost, to achieve the same results attained with a lower dose of Procardia XL; 2) Miles' price comparisons are based on the average wholesale price, and because patients pay retail prices, there is no guarantee that patients will save; and 3) additional costs may be incurred in switching patients from Procardia XL to Adalat CC, including additional costs ensuing from adjusting the dosage.

Miles responds that: 1) Pfizer itself promotes its own products using the same kind of price comparison between non-bioequivalent drugs; 2) although the advertised 25% cost reduction pertains to the average wholesale price, other language suggests that the 25% savings is at the outer limits; and 3) although additional costs may ensue from adjusting the dosage appropriately, in the long run these patients could experience significant savings.

7. Reggio Dep. Exh. 4A, 5; Dawes Dep. Exh. 5, 6.

8. Shulman, *Impact of Cost Problems on Morbidity in a Hypertensive Population,* American Journal of Preventive Medicine 1991 7(6):374; Kirban,

The court finds that Miles' claim is not misleading because Miles explicitly designates the 25% savings as pertaining to the average wholesale price, and uses language which suggests the savings represent the outer limits, i.e. "Save up to $192 a year." Further, although it is plausible that some additional costs may ensue from switching patients from Procardia XL to Adalat CC, long term savings could be greater than short term costs. Finally, the court finds that Pfizer, whom it must presume is in full compliance with the laws concerning misleading advertising, promotes its own products using similar comparisons [7] among non-bioequivalent drugs.

### 3. *Compliance*

■■■ Pfizer next asserts that Miles' statement that the lower cost of treatment with Adalat CC compared to Procardia XL will lead to improved patient compliance is false and misleading. Pfizer claims the statement is false and misleading because it stems from a study performed by Miles which is ostensibly described as "independent" in Miles' press kit. Furthermore, according to Pfizer, the statement is misleading because compliance may be ultimately reduced by the recommendation that Adalat CC should be taken on an empty stomach. Miles' responds that the press kit makes clear that the survey was "sponsored by the Pharmaceutical Division of Miles, Inc." Further, there is extensive evidence cited in the press kit supporting the statement that lower cost affects compliance with a hypertension medication regime.

The court finds that the press kit indeed makes clear that the survey was "sponsored by the Pharmaceutical Division of Miles, Inc." Additionally, there is sufficient evidence in the press kit [8] to support Miles' assertion that a lower price may serve to increase patient compliance. Therefore, the court concludes that Miles' compliance claim is not false and misleading. Although it is plausible that the empty stomach recommen-

*Issues of Cost and Compliance with an Antihypertensive Regimen: A Behavior Study of Unemployed Hypertensives.* June 1993.

dation for Adalat CC administration may reduce compliance, it is at least equally plausible that a less expensive drug will increase compliance simply because a less expensive drug is more attainable than a more expensive one.

## II

### 1. *Consumer Confusion*

 In order for Pfizer to establish an actionable Lanham Act claim, it must show not only that Miles' promotional campaign is misleading, but it must also establish by a preponderance of the evidence that the alleged misleading promotional campaign created the likelihood of consumer confusion. *McNeil—P.C.C., Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544 (2d Cir.1991). The party offering a survey as proof of consumer confusion bears the burden of proving its reliability. *American Home Prods. Corp. v. Barr Labs, Inc.*, 656 F.Supp. 1058, 1062 (D.N.J.), aff'd, 834 F.2d 368 (3d Cir.1987). See also *Johnson and Johnson Merck Consumer Pharmaceutical Co. v. Smithkline Beecham Corp.*, 960 F.2d 294 (2d Cir.1992), where the Second Circuit stated,

> The probative value of a survey depends entirely upon its fundamental fairness and objectivity, which in turn depends upon many factors, such as whether it is properly "filtered" to screen out those who got no message from the advertisement, whether the questions are directed to the real issues, and whether the questions are leading or suggestive.

*Id.* at 300.

In support of its contention that Miles' promotional campaign created the likelihood of consumer confusion, Pfizer offers the Schmittlein survey and the Passman survey.

### a). Schmittlein Survey

The Schmittlein survey was designed by David Schmittlein of the Wharton School at the University of Pennsylvania. The survey was implemented by the Data Development Corporation in August 1993, whereby 406 registered pharmacists were telephoned and asked about their perceptions regarding the similarities between Adalat CC and Procardia XL.

The study purported to find a substantial misperception among pharmacists regarding Adalat CC, greater in any event than the misperception held concerning any other drug as a potential item similar to Procardia XL. This "substantial misperception" was allegedly established even though 91% of the pharmacists surveyed could not, in the first instance, bring Adalat CC to mind as a drug for the treatment of hypertension.

The study suffered other significant flaws. First, the respondents were not shown any of Miles' promotional materials, which makes it impossible to determine whether Miles had caused the mistaken perceptions.[9] Second, the questioning format was leading. Questions were asked pertaining to Adalat CC and Procardia XL individually, mentioning no other drug, and then the key questions were asked pertaining to bioequivalence and substitution. Third, there is evidence that the respondents contradicted themselves on key issues, i.e., some failed to demonstrate an understanding for bioequivalence, and fourth, the survey lacked experimental control.

### b). The Passman Survey

The second survey was designed and implemented by Norman Passman of Guideline Research Corporation in New York. Three hundred registered pharmacists were exposed to a published advertisement for Adalat CC. In addition, a control group was established and given the same advertisement with deletions made of information believed to be the source of the misperception. The study purportedly revealed that a substantial percentage of respondents erroneously believed that Adalat CC and Procardia XL are substitutable, bioequivalent, and/or interchangeable.

However, the Miles advertisement which Passman used for the survey was not directed at pharmacists. The advertisement origi-

---

**9.** Pfizer asserts that Miles August 1993 telephone survey of 40 pharmacy professionals corroborates the Schmittlein findings. However, like the Schmittlein survey, no experimental control was utilized, and respondents were not shown any of Miles' promotional materials.

nally ran in medical journals and was aimed at physicians. There is also evidence that Passman may have misinterpreted the pharmacists' verbatim responses, because he characterizes as "misled" every respondent who described Adalat CC and Procardia XL as the same, equal, or equivalent. Despite certain differences between the two drugs, there are similarities between the two which may have prompted the "same as" response. These similarities include the fact that since the two contain the same active ingredient, a pharmacists might characterize them as "generically equivalent."

Because of the errors in both surveys, the court concludes that Pfizer has not demonstrated through them a likelihood of consumer confusion.

### 2. *Miles' Medical Professionals*

■ Pfizer asserts that Miles' medical professionals, E. Paul MacCarthy and Kent Allenby, have introduced misleading information into the marketplace through presentations to potential customers. In particular, Pfizer asserts that these two: 1) falsely implied in a video presentation that Procardia XL is not indicated as a "first line" therapy for vasospastic angina (a rare form of angina); 2) neglected to present information concerning the FDA titration recommendation for Adalat CC; 3) misleadingly compared the side effect profiles of the two drugs; and 4) distributed a summary of the "switch study" that only discussed that portion of the study where patients were switched from Procardia XL to Adalat CC.

Miles responds that: 1) although MacCarthy mistakenly implied that Procardia XL is not indicated as a "first line" therapy for vasospastic angina, the error is inconsequential because MacCarthy expressly stated that Adalat CC is not indicated for angina at all; 2) there is no requirement that professionals restate all the information contained in a drug package insert at oral presentations to other professionals; 3) since the side effect profiles between Adalat CC and Procardia XL are similar, there is nothing misleading about the doctors' comparison; and 4) the "switch study" summary describing only that portion of the study where patients were

switched from Procardia XL to Adalat CC was used because it addressed the most frequently asked questions by patients as to the effects of switching. Today, a more comprehensive summary is used to accommodate requests for a broader range of comparative information.

Since MacCarthy expressly stated in the video presentation that Adalat CC is not indicated for angina, the error relating to vasospastic angina provides no basis for concluding that Miles' has misled anyone about whether Adalat CC is "the same as" or "equivalent to" Procardia XL. With respect to MacCarthy and Allenby's failure to present information regarding the Adalat CC titration recommendation, Pfizer cites no authority, nor can the court find any, requiring such information at presentations to professionals. As for MacCarthy and Allenby's statements regarding the side effect profiles of the two drugs, Pfizer has failed to establish that there is any significant difference in ensuing side effects. Therefore, these statements are not misleading. Finally, with regards to Miles' summary of the "switch study", since the court has concluded that the undistributed portions of the study do not establish that Adalat CC is not equivalent to Procardia XL, the summary is not misleading.

Therefore, the presentations given by E. Paul MacCarthy and Kent Allenby are not misleading. Since Pfizer failed to establish by a preponderance of the evidence "a likelihood of consumer confusion", there is no predicate that may serve as the basis for a conclusion that Miles has violated the Lanham Act.

### B. MILES' ALLEGED LITERALLY FALSE STATEMENTS

"When a merchandising statement or representation is literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public." *Coca Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982); *American Home Products Corp. v. Johnson and Johnson*, 577 F.2d 160, 165 (2d Cir. 1978); *American Brands, Inc. v. R.J. Reyn-*

*olds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976).

### 1. *Miles' Sales Representatives*

 Pfizer argues that twenty-five "fact affidavits" reveal that Miles' sales representatives have repeatedly misrepresented to physicians and pharmacists that Adalat CC is "the same as" or "just like" or "a generic" Procardia XL. Pfizer further complains that a Miles' representative, Barry Roecker, allegedly told Pfizer's medical expert, Randall Zusman,

> Nifedipine is nifedipine: there is no reason not to expect Adalat CC to be effective. I would not hesitate to use it in the treatment of a patient with chronic stable angina pectoris.

*Affidavit of Randall Zusman,* Feb. 22, 1994. Since these statements are allegedly literally false, if proven, they are *per se* violations of the Lanham Act, and may be enjoined without further inquiry as to their effects on the intended audience.

Miles responds that Pfizer's twenty-five "fact affidavits" detailing Miles' misrepresentations are hearsay. Twenty of the affidavits do not describe any particular instance of false statements by Miles' representatives. The remaining five affidavits allegedly represent comments by members of Pfizer's sales force and although they do describe such instances, they do not identify the Miles' representative who made the false statement.

In regards to Zusman's conversation with Roecker, Roecker's affidavit contradicts Zusman's account of the facts. Roecker in his affidavit says that he was in another city on the day of this alleged conversation, and when he did speak with Zusman some months later, he did not make any statements about the use of Adalat CC for angina. Furthermore, Miles' argues that Zusman

himself has acknowledged that Adalat CC may be effective for the treatment of angina:

> Q: Based on what you know about the pharmacokinetics of nifedipine capsules on the one hand and Procardia XL on the other hand, and based on what you know about the pharmacokinetics of Adalat CC, would you have any reason to think that Adalat CC would not in fact be effective for angina.
>
> A: [Dr. Zusman]: Nifedipine is certainly effective for angina. I think if you were to give an adequate dose of Adalat CC, that ought to be effective in treatment of angina.

*Deposition of Randall Zusman,* March 22, 1994, at 83.

The court finds that the affidavit evidence presented is not sufficiently reliable to provide the basis for a finding that literally false statements were made by Miles' representatives. Further, since both drugs share important similarities, the court is therefore not convinced that these statements, even if made, are necessarily literally false.[10]

### 2. *Miles' Cost Comparison Advertising*

 Pfizer claims that Miles' cost comparison advertising is literally false because it omits information as to the other differences between Adalat CC and Procardia XL. Miles responds that omissions are generally not actionable under the Lanham Act.

> [A] failure to inform consumers of something, even something that they should know, is not per se a misrepresentation actionable under Section 43(a) of the Lanham Act.

*McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 532 (S.D.N.Y.1980). This rule is standard in Lanham Act cases.[11] However,

---

**10.** Pfizer's pharmacy expert, Professor Palumbo, testified that two drugs can be "generically equivalent" even though they produce different blood levels of the active ingredient over time. (*Palumbo Dep. Transcript,* 28–30) and Miles' pharmacy expert, Professor Fink, testified that, "the more common and more commonly encountered use of the term [therapeutically equivalent] is that you have different products being

used to achieve the same therapeutic effect." *Hearing Transcript,* 6/24/94 at 437.

**11.** *See American Home Products Corp. v. Johnson & Johnson,* 672 F.Supp. 135 (S.D.N.Y.1987); *International Paint Co. v. Grow Group, Inc.,* 648 F.Supp. 729 (S.D.N.Y.1986); *Ragold, Inc. v. Ferrero, U.S.A., Inc.,* 506 F.Supp. 117 (N.D.Ill.1980).

While it has been stated that a failure to disclose facts is not actionable under § 43(a), it is equally true that a statement is actionable under § 43(a) if it is *affirmatively misleading, partially incorrect,* or *untrue* as a result of a failure to disclose a material fact.

*U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 921 (3d Cir.1990). (emphasis added).

Since the court has already determined that Miles' cost comparison's are not misleading, the focus then narrows to whether untrue or literally false statements resulted from Miles' failure to disclose a material fact.

■ For purposes of § 43(a), a material fact is one which, if known to the purchaser, would likely influence the purchasing decision. *U.S. Healthcare,* 898 F.2d at 922 (3d Cir.1990). This does not mean that "all facts material to a consumer's decision to purchase a product or service be contained in each advertisement ... the question of when section 43(a) reaches failure to disclose information material to a consumer's purchasing decision is an open question for the courts." [12]

The few cases in which omissions have been found to make a statement untrue generally concern a negative comparison with a competitor's product that omits information that would weaken a superiority claim. *E.R. Squibb & Sons, Inc. v. Stuart Pharmaceutical,* Civ. No. 90–1178 (AET), 1990 WL 159909 1990 U.S.Dist. LEXIS 15788 (D.N.J. Oct. 1990) (omission of side effects caused by advertiser's hypertension drug was false when same advertisement presented negative side effects of competitor's product); *Oil Heat Institute v. Northwest Natural Gas,* 708 F.Supp. 1118 (D.Or.1988) (false for gas company advertisement to imply that maintenance for gas furnace requires a change of filters twice a year, while failing to disclose

that additional routine maintenance would also be required.)

In the present instance, Miles' does not purport to offer Adalat CC as superior to Procardia XL; the only comparison made between Adalat CC and Procardia XL concerns the product's average wholesale price. The material exhibiting the cost comparisons [13] also contains information detailing the key differences between Adalat CC and Procardia XL. This disclosure negates the existence of an omission of a material fact which would render the comparison untrue.

Even Pfizer, whose advertisements are presumably in compliance with the Lanham Act, uses the same advertising technique for Procardia XL by comparing its price to that of ten different drugs, including immediate release Adalat.[14] Pfizer includes nothing in this advertisement about the differences among the cited drugs, even though the drugs subject to the comparison are not bioequivalent, do not all use the same active ingredient, and have different release mechanisms and indications.

Thus, based upon the foregoing, the court concludes that Pfizer has failed to establish by a preponderance of the evidence that Miles' printed cost comparisons or oral sales representations are literally false.

## C. MILES' PHARMACY INFORMATION PROGRAM

■ Pfizer next seeks to enjoin Miles' Pharmacy Information Program on grounds that it is a kickback scheme in violation of CUPTA, Conn.Gen.Stat. § 42–110b; the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1); the Medicaid antikickback statute, 42 U.S.C. § 1320–(7b)–(2); and common law. Under the program, Miles' paid pharmacists $35 for each new Adalat CC pre-

12. S.Rep. No. 515, 100th Cong., 2d Sess. 41 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577, 5603–04 (1988). Here, Congress explicitly rejected a proposed amendment to § 43(a) that would have codified the prohibition against material omissions.

13. Miles' cost comparison charts appear in the Adalat CC Question and Answer Booklet, Miles June 16, 1993 promotional letter to pharmacists, and Miles June 21, 1993 letter to pharmacists.

Both the letters and the Adalat CC Question and Answer Booklet contain the Adalat CC package insert which describe Adalat CC's unique qualities. See Exhibits to Affidavit of Karen Dawes, submitted with Pfizer's Motion For Preliminary Injunction, October 21, 1994.

14. Pfizer Visual Aid, Exhibit 11 to Miles Affidavits Submitted as Exhibits in Opposition to Pfizer's Motion For Preliminary Injunction, Volume II. December 10, 1993.

scription in exchange for new customer "cognitive counseling services." Miles responds that the program was terminated on November 30, 1993, and therefore Pfizer's motion to enjoin the program is moot.

■ It is a basic principle of equity that injunctive relief restricting a party's freedom of action should not be issued unless there is a demonstrated need for it. In particular, a court should not take the extraordinary step of entering a preliminary injunction unless the court can conclude, based on the evidence presented to it, that there is an actual, rather than speculative need for interim restraint. *See JGS Trading Corp. v. Tray Wrap*, 917 F.2d 75, 80 (2d Cir.1990); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985); *see also* Dan BG. Dobbs, *Handbook of the Law of Remedies: Damages—Equity—Restitution*, § 2.10 at 108–109 (1973).

In *Metro Kane Imports Ltd. v. Federated Department Stores, Inc.*, 625 F.Supp. 313, 318 (S.D.N.Y.1985), *aff'd mem*, 800 F.2d 1128 (2d Cir.1986), the court denied a preliminary injunction on the basis of an affidavit by the defendant retailer stating that it was voluntarily withdrawing a product that allegedly infringed on the trade dress of the plaintiff's product. In *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 36 (2d Cir.1988), the defendant in a Lanham Act case voluntarily withdrew some of the commercials, and the court consequently considered only those commercials that had not been withdrawn. In *Atlantic States Legal Foundation, Inc. v. Pan American Tanning Corp.*, 993 F.2d 1017, 1019–22 (2d Cir.1993), the court found that injunctive relief in a private suit is rendered moot by defendant's settlement with a state agency, even though a request for damages was not.

In the present case, Miles terminated the program on November 30, 1993. On April 4, 1994, Miles entered into a formal agreement with eleven states, including the state of Connecticut, not to resume the program or to implement any substantially similar program. Since this agreement is enforceable by the attorneys general of each of the eleven states, the court does not find that preliminary injunctive relief is necessary. Therefore, the court denies Pfizer's motion to temporarily enjoin Miles' Pharmacy Information Program.

*Conclusion*

Pfizer has failed to establish by a preponderance of the evidence that Miles represented Adalat CC as the "equivalent" to Procardia XL with respect to the differences between the drugs which are not in dispute. Further, Pfizer has not demonstrated that Adalat CC is not the equivalent to Procardia XL with respect to the disputed differences. Therefore, any implication by Miles of equality with respect to these differences is not misleading. Pfizer has also failed to establish that Miles' "less expensive" claim is misleading, as well as its claim that a less expensive Adalat CC may lead to improved patient compliance with a hypertension medication regime. Furthermore, since Pfizer has failed to show a likelihood of consumer confusion, Miles' promotional material, advertisements, and presentations are not actionable under the Lanham Act as misleading or implicitly false. Pfizer has also failed to establish that Miles printed cost comparisons are literally false, or that Miles' sales representatives made literally false statements.

Therefore, Pfizer is not likely to succeed on the merits at trial on the claim that Miles has violated the Lanham Act or CUTPA. In the absence of such a violation, Pfizer is not entitled to a presumption of "irreparable harm"[15] for purposes of its request for pre-

---

**15.** Even if Pfizer had successfully established a Lanham Act violation or a violation of CUTPA, a "presumption of irreparable harm", would be suspect in consideration of the February 8, 1994 remarks of Henry A. McKinnell, Executive Vice President and Chief Financial Officer of Pfizer. Here, Mr. McKinnell stated, "The launch of one competitor, Adalat CC, in August 1993 *did not significantly affect XL's market share, which remained at approximately 6.5% of total cardiovascular prescriptions throughout the second half of* *the year.* It is particularly noteworthy that demand for XL in managed care settings continues to be strong. Clearly these cost-conscious providers recognize that milligram-for-milligram cost efficacy equivalence between XL and CC has not been demonstrated, and that price comparisons on such a basis are therefore inappropriate. XL's obvious therapeutic superiority has allowed it to maintain its strong position. Surreply Brief

liminary injunction. Thus, Pfizer's application for a preliminary injunction is denied. The court also denies Pfizer's application to enjoin Miles' Pharmacy Information Program.

## COUNTERCLAIM

By way of counterclaim, Miles seeks to enjoin Pfizer from an alleged campaign intended to disparage Adalat CC. Specifically, Miles asserts that Pfizer has orchestrated a campaign of circulating literal falsehoods about Adalat CC in an effort to thwart competition from Miles.

## A. MILES' ESTABLISHMENT CLAIMS AGAINST PFIZER

### Applicable Law

An establishment claim is one that represents that a particular product attribute has been proven by medical or scientific evidence. See *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991). The truth or falsity of such a claim is tested by whether the supporting evidence possessed by the advertiser is adequate to "establish" the proposition in question. *Id.*

The distinction between a "regular" advertising claim and an "establishment" claim was set forth by the Second Circuit in *Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 119 (2d Cir.1984) and *Castrol, Inc., v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.1992). In *Castrol,* the court explained that where the defendant's claim is a straight "superiority" claim, the plaintiff "must affirmatively prove defendant's product equal or inferior." *Id.* at 63. Where, however, a defendant's "superiority" claim is based upon either an explicit or implicit assertion that "tests" establish the superiority of a given product,

[the] plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited ... [Furthermore, the] plaintiff can meet this burden by *demonstrating that the tests*

of Defendant Miles, Inc., April 22, 1994, Attachment 3 (emphasis added).

*were not sufficiently reliable* to permit a conclusion that the product is superior. *Id.* at 63 (emphasis added).

The context in which the defendant's assertion is made is also important in determining whether the defendant has violated the Lanham Act. In *Sandoz Pharmaceutical Corp. v. Richardson–Vicks, Inc.*, 902 F.2d 222 (3d Cir.1990), the court discussed promotional representations to physicians in a Lanham Act case and stated,

[w]e note that context can often be important in discerning the message conveyed and this is particularly true where, as here, the target of the advertising is not the consuming public but a more well informed and sophisticated audience.

*Id.* at 229, citing *Plough, Inc. v. Johnson and Johnson Baby Prod. Co.*, 532 F.Supp. 714, 717 (D.Del.1982).

Once an establishment claim has been proven, it is actionable under § 43(a) of the Lanham Act as a literal falsehood. In such an instance, "relief may be granted without reference to the advertisements' impact on the buying public." *Coca Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982).

In evaluating the reliability of the tests, [t]he fact-finder's judgment should consider all relevant circumstances, including the state of the testing art, the existence and feasibility of superior procedures, the objectivity and skill of the persons conducting the tests, the accuracy of their reports, and the results of other pertinent tests.

*Procter & Gamble v. Chesebrough–Pond's, Inc.*, 747 F.2d 114, 119 (2d Cir.1984).

### Discussion

1. *Pfizer's Alleged Use of The Chung Article*

Miles asserts that Pfizer is inappropriately using a 1987 study of different nifedipine products called the "Chung article",[16] in order to "establish" that Procardia XL is superior to Adalat CC. Specifically, Miles

16. Menger Chung, Clinical Pharmacokinetics of Nifedipine Gastrointestinal Therapeutic System (1987).

argues that Pfizer is claiming that the Chung article establishes that, "one would have to use two Adalat CC [tablets] to get the benefits of one Procardia XL, ..."[17] Since the article discusses a drug called "Adalat Retard", which is different than "Adalat CC",[18] Miles claims that the article is irrelevant to the relationship between Adalat CC and Procardia XL. Therefore, according to Miles, the article cannot "establish" that Procardia XL is superior to Adalat CC.

Pfizer responds that the Chung article is relevant to the relationship between Procardia XL and Adalat CC because it shows that different delivery systems can cause nifedipine to have different clinical results. Furthermore, the article on its face does not purport to compare Procardia XL with Adalat CC, nor does it suggest that Adalat CC and Adalat Retard are the same product.

The portion of the Chung article dispositive to this issue states,

the plasma drug concentration versus time profile suggests that twice daily administration is required for Adalat Retard, whereas once a day dosing is feasible with nifedipine GITS tablet [Procardia XL].

Menger Chung, *Clinical Pharmacokinetics of Nifedipine Gastrointestinal Therapeutic System,* (1987) at 5. Reggio Affidavit, Exhibit A, June 29, 1994.

Although the article on its face does not purport to compare Procardia XL with Adalat CC, the court concludes that the language of the article implies that "Adalat Retard" is the same as "Adalat CC" when viewed in the light of the circumstances of its presentation. These circumstances include: 1) the target audience's lack of special knowledge regarding the distinction between "Adalat Retard" and "Adalat CC"; 2) the explicit message contained in a letter accompanying the test materials; and 3) the ambiguity of the language used in the Chung article.

First, Adalat Retard is not marketed in the United States.[19] Therefore, American physicians and pharmacists would have little reason to suspect a difference between a product called "Adalat Retard" and a product called "Adalat CC." Second, Pfizer attached the Chung article to its "Medical Services Inquiry Letter"[20], which was sent to physicians and pharmacists throughout the country. In this letter, Pfizer specifically implies that "Adalat CC" is the same as "Adalat Retard" because the letter states that the enclosed attachments describe "the significant differences between Procardia XL and Adalat CC." Since the Chung article actually describes the differences between Procardia XL and Adalat Retard, and not Adalat CC, there is an inherent conflict between the letter and the attachment which is not addressed anywhere by Pfizer, and thus suggests that Adalat CC and Adalat Retard are the same.

Finally, the Chung article itself is ambiguous because it does not make a specific reference to Procardia XL, but instead describes

17. Timothy Kidd Affidavit, December 3, 1993. Affidavit Submitted in Support of Miles' Motion for Preliminary Injunction, April 22, 1994.

18. Adalat Retard and Adalat CC differ in that Adalat Retard is a twice a day medication, and is not marketed in the United States.

19. See direct examination of Randall Zusman, Hearing Transcript June 23, 1994 at 149.

20. Pfizer's Medical Services Inquiry Letter, Eugene Weiss to Daniel Maloney, September 16, 1993. Exhibit 10 to Miles Motion For Preliminary Injunction, April 22, 1994. This letter also attaches a chart entitled, "Procardia XL vs Adalat CC: Key Differentiating Features". Miles argues that sections in the chart describing "Trough/Peak Ratios" and "Adverse Effects" are literally false because the comparison is not supported by a direct clinical trial. However, because the attached letter explicitly says, *"Direct comparison between these agents is difficult because no controlled clinical studies comparing the two formulations are available",* the chart is sufficiently qualified so as to preclude a finding of a Lanham Act violation. Miles also argues that the chart section entitled "Young vs Elderly: Single Dose to Steady State" which describes Adalat CC as "disproportionate" is literally false because a "disproportionate" characterization conflicts with data generated in Miles' pharmacokinetic study submitted to the FDA. However, because Miles has not demonstrated how the data generated in its pharmacokinetic study necessarily precludes a characterization as "disproportionate", it is not actionable under the Lanham Act as a literal falsity. *See also* Affidavit of Randall Zusman, pages 10–11, Affidavits Submitted as Exhibits In Support of Plaintiff's Motion For Preliminary Injunction, February 22, 1994.

Procardia XL as the "GITS formulation." Similarly, "Adalat CC" is not specifically described anywhere in the article, but a direct reference is made to "Adalat Retard". Since the article, in accordance with Pfizer's Medical Services Inquiry Letter, is supposed to describe significant differences between Procardia XL and Adalat CC, one reading the article would reasonably infer that because "GITS formulation" stands for "Procardia XL", "Adalat Retard" must stand for "Adalat CC". Thus, the message conveyed is that scientific evidence in the form of the Chung article "establishes" that Procardia XL is twice as effective as Adalat CC, or simply "superior" to Adalat CC.

In *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57 (2d Cir.1992), Castrol sued Quaker State for running an ad stating that "tests" prove Quaker State oil protects "better at start-up." The court found the claim literally false because the "tests" presented showed that Quaker State has a "faster oiling time", and were actually irrelevant to Quaker State's claim of better protection at start-up. *Id.* at 63–64.

In the present instance, Pfizer's letter specifies that it is describing the "significant differences" between Procardia XL and Adalat CC. These "significant differences" leave the reader with the impression that the Chung article shows that Procardia XL is superior to Adalat CC, when in fact the Chung article is irrelevant [21] to the relationship between Procardia XL and Adalat CC. The court concludes that use of the Chung article together with the Medical Services Inquiry Letter is a literal falsity actionable under the Lanham Act because the letter

and article imply that scientific tests establishes that Procardia XL is proportionately more effective, or superior to, Adalat CC.

The Medical Services Inquiry Letter attaching the Chung article, independently corroborates assertions made by Miles' sales representatives that Pfizer representatives have used the Chung article to "establish" that Procardia XL is superior to Adalat CC. In this connection, the court finds credible the Miles' assertion that Pfizer sales representatives have stated to medical professionals that "one would have to use two Adalat CC [tablets] to get the benefits of one Procardia XL, . . .", while handing the medical professional a copy of the Chung article to "establish" this proposition.[22] Such statements by Pfizer representatives constitute literal falsity and are actionable under the Lanham Act.

### 2. Pfizer's Alleged Relative Strength Claims.

■■■ Miles next asserts that Pfizer has orchestrated a campaign of spreading literally false information into the marketplace concerning the relative strengths of Adalat CC and Procardia XL. Specifically, Miles asserts that Pfizer sales representatives are: 1) claiming without any documentary proof that "a patient would have to take 60 or 90 mg of Adalat CC to obtain the benefits of 30 mg of Procardia XL"[23]; and 2) in other instances, offering as proof for this claim a "cross study comparison" of Pfizer's "Lewis study" of Procardia XL, against data exhibited in "Miles's Product Monograph" concerning Adalat CC.[24] Miles asserts that because Pfizer's

---

**21.** In a very general sense, the Chung article is relevant to show that different delivery systems can cause nifedipine to have different clinical results. However, Pfizer's attached Medical Services Inquiry Letter does not purport to describe *generally* the differences between a nifedipine delivery system and therapeutic results. Rather, the letter *specifically* addresses the differences between Procardia XL and Adalat CC. An article which discusses "Adalat Retard" cannot illustrate how Procardia XL differs from "Adalat CC", and is, therefore, irrelevant.

**22.** Miles representatives claim that Pfizer representatives have used the article to show that "one would have to use two Adalat CC [tablets] to get the benefits of one Procardia XL, and therefore

there really [are] no cost savings associated with using Adalat CC." Affidavit of Timothy Kidd, December 3, 1993. *See also* affidavits of Michael Hogan, Linda Jackson, Alfred Nichols, and James Webb submitted as attachments to Miles' Motion For Preliminary Injunction, April 22, 1994.

**23.** *See* affidavits of Carlucci, Gemuenden, and Johnson, Affidavits Submitted as Exhibits In Support of Miles Motion For Preliminary Injunction, December 3, 1993.

**24.** Affidavit of Marvin Kelly, December 3, 1993, Affidavits Submitted as Exhibits in Support of Miles' Motion For Preliminary Injunction, De-

claim is not supported by comparative scientific tests, i.e., a head to head study, it is therefore not supported by "reliable" tests, and thus Pfizer's relative strength superiority claim satisfies the requirements of an establishment claim under § 43(a) of the Lanham Act.

Pfizer responds that: 1) its relative strength superiority claim is not unsubstantiated because data collected from Miles' "switch study", as interpreted by Randall Zusman, support the conclusion that indeed twice as much Adalat CC 30 mg is needed to equal the blood pressure lowering effect of Procardia XL 30 mg; and 2) there is nothing literally false about using cross study comparisons of the "Lewis study" and the "Adalat CC Product Monograph" because physicians are aware of the variables inherent in cross study comparisons. Furthermore, there is no evidence that doctors were misled into thinking that the data separately constituted a single, head to head study.

In *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57 (2d Cir.1992), the court explained that where the defendant's claim is a straight superiority claim, and makes no mention of tests, the plaintiff must "affirmatively prove defendant's product equal or inferior." *Id.* at 63. Where, however, the defendant's superiority claim is based upon either an explicit or implicit assertion that "tests" establish the superiority of a given product,

> [the] plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they are cited ... [Furthermore, the] plaintiff can meet this burden by demonstrating the tests were not sufficiently reliable to permit a conclusion that the product is superior.

*Id.* at 63.

Further, in *Sandoz Pharmaceutical Corp. v. Richardson—Vicks, Inc.*, 902 F.2d 222 (3d Cir.1990), the court discussed promotional representations to physicians in a Lanham Act case and stated,

We note that context can often be important in discerning the message conveyed and this is particularly true where, as here, the target of the advertising is not the consuming public but a more well informed and sophisticated audience.

*Id.* at 229, *citing Plough, Inc. v. Johnson and Johnson Baby Prod. Co.*, 532 F.Supp. 714, 717 (D.Del.1982).

In the present case, where Pfizer representatives have claimed that "a patient would have to take 60 or 90 mg of Adalat CC to obtain the benefits of 30 mg of Procardia XL", and did not offer any scientific proof, such a claim is a "straight superiority claim" because Pfizer did not state or imply that the claim is based upon "tests." In this instance, because Miles has not proven that Procardia XL is equal or inferior to Adalat CC, Pfizer's claim is not actionable under the Lanham Act.

Where Pfizer representatives have offered to physicians the "cross study comparison" of the "Lewis study" of Procardia XL against data exhibited in "Adalat CC's Product Monograph," such representations conveyed the message that "tests" establish that the relative strength of Procardia XL is superior to Adalat CC. Therefore, such representations could serve as the basis for an "establishment claim." However, because the conclusions reported in both the "Lewis study" and the "Adalat CC Product Monograph" are not literally false, and are based upon reliable tests, the issue becomes whether a cross-study comparison of the two tests "is likely to mislead and confuse consumers." *McNeil–P.C.C. Inc. v. Bristol Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991).

In this instance, there is no evidence that the doctors were misled into thinking that the "tests" offered by Pfizer's representatives constituted a single, head to head study. Since physicians are presumably aware of the inherent limitations in cross study comparisons [25] which make them less scientifically "reliable" compared to other methods (i.e., head to head study), they are likewise aware

cember 3, 1993. *See also* Affidavit of David Anderson, Affidavits Submitted In Support of Miles' Motion For Preliminary Injunction, April 22, 1994.

25. Affidavit of Randall Zusman, Affidavits Submitted In Support of Pfizer's Motion For Preliminary Injunction, February 22, 1994.

that the "propositions for which they are cited" (i.e., Procardia XL has a stronger relative strength) are necessarily qualified. The court therefore concludes that Miles has failed to establish that Pfizer's use of a cross study comparison of the "Lewis study" against data from Miles' "Adalat CC Product Monograph" is actionable as either a literal falsity or misleading representation under the Lanham Act.

### 3. Pfizer's Use of The Hilleman Study.

█ Miles next asserts that Pfizer is claiming that "tests" in the form of "the Hilleman study"[26] support the proposition that 40% or more of patients switched from Procardia XL to Adalat CC will not be able to control their blood pressure without either taking more milligrams of Adalat CC or other additional drugs.[27] In other words, Pfizer is claiming that, milligram for milligram, Procardia XL is proportionately stronger than Adalat CC. Miles claims that Pfizer's assertion is literally false because the Hilleman study is not sufficiently reliable to support such a proposition. Specifically, Miles claims that the methods used in Hilleman study preclude reliable findings because, as Hilleman himself conceded, there was no written protocol, no controls, no blinding, and data (blood pressure measurements) was collected from subjects over the telephone.[28]

Pfizer does not deny using the Hilleman study in its promotional activities. Rather, Pfizer responds that the study is sufficiently reliable to support the proposition that, milligram for milligram, Procardia XL is proportionately stronger than Adalat CC.[29]

In *Procter & Gamble Co. v. Chesebrough–Ponds, Inc.,* 747 F.2d 114 (2d Cir.1984), the court held that in order to prove falsity in a Lanham Act case,

[the plaintiff] assumed the burden of showing the tests referred to by [the defendant] were not sufficiently reliable to permit one to conclude with reasonable certainty that they establish the proposition for which they are cited. The fact-finder's judgment should consider all relevant circumstances, including the state of the testing art, the existence and feasibility of superior procedures, the objectivity and skill of the persons conducting the tests, the accuracy of their reports, and the results of other pertinent tests.

*Id.* at 119. Further, as discussed previously, when promotional representations are made to physicians, the court will examine the representation in light of the context of a well informed and sophisticated audience. *Sandoz Pharmaceutical Corp. v. Richardson–Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990), citing *Plough, Inc. v. Johnson and Johnson Baby Prod. Co.,* 532 F.Supp. 714, 717 (D.Del. 1982).

In both *Procter & Gamble Co.,* 747 F.2d at 119 (2d Cir.1984) and *Castrol, Inc.,* 977 F.2d at 63 (2d Cir.1992), the Second Circuit has made clear that if a company advertises that "tests" support its superiority claim, the supporting tests must be "sufficiently reliable." A slightly different situation is presented where, as here, a company does not merely claim that "tests" support its superiority claim, but provides to the consumer an actual

---

26. Daniel Hilleman, *Drug Delivery Systems: Focus on Extended Release Nifedipine* (1993). In this study, 24 patients with mild to moderate hypertension controlled by Procardia XL were switched to the identical dose of Adalat CC. After the switch, the study reports that 10 patients had to either take more Adalat CC or add additional medications to control their hypertension. *See* Exhibit 1 to Affidavit of Timothy Kidd, April 22, 1994, Submitted In Support of Miles Motion For Preliminary Injunction.

27. *See* Affidavit of Timothy Kidd, April 22, 1994, describing use of the Hilleman Study Report by Pfizer representatives. Affidavits Submitted in Support of Miles' Motion For Preliminary In-

junction. See also Pfizer "Monthly POA Report" describing Pfizer's use of the Hilleman study in electronic teleconferences to physicians. "[Dr. Hilleman] reinforces that in his experience in switching patients from Procardia XL to Adalat CC there has been a 45% failure rate." Exhibit 30, Submitted in Support of Miles' Motion For Preliminary Injunction, April 22, 1994.

28. *See* Deposition of Daniel Hilleman, March 17, 1994.

29. *See* Pfizer's Reply Brief In Support of Its Motion For Preliminary Injunction, February 22, 1994, at 63.

copy of the test abstract. In this instance, because the consumers are physicians who are sophisticated and well informed, they are thus in the position to decide for themselves whether the "tests" are "sufficiently reliable to permit one to conclude with reasonable certainty that they establish the proposition for which they are cited." *Procter & Gamble Co.*, 747 F.2d at 119 (2d Cir.1984).

In the present matter, Pfizer presented the Hilleman study's conclusions to physicians through both "electronic teleconferences" [30] and by distributing to physicians a copy of the test abstract entitled "Drug Delivery Systems: Focus On Extended Release Nifedipine." [31] The test abstract discusses the 40% treatment failures resulting from switches from Procardia XL to Adalat CC, but it does not discuss the experimental methodology and controls (or lack thereof) employed by Hilleman to reach his conclusions. Therefore, even physicians, as a sophisticated and well informed audience, could not adequately judge for themselves whether the tests were "sufficiently reliable" to support the conclusion that, milligram for milligram, Procardia XL is stronger than Adalat CC. Since Hilleman does not discuss the study's methods, the court need not consider the special circumstance that may exist where an advertiser more than just claims that "tests", establish its superiority claim, but distributes to consumers an actual copy of the test abstract.

Therefore, the court concludes that because of the absence of a written protocol and scientific controls, including blinding, to ensure the objectivity and accuracy of the data, the Hilleman study cannot be characterized as "reliable." [32] Since Pfizer presented the Hilleman study to show that "tests" establish that Procardia XL is proportionately stronger than Adalat CC, and this assertion is not based upon reliable tests, it is actionable as a literal falsity under the Lanham Act.

### 4. *Pfizer's Alleged Use of FDA Statistician's Review to Disparage Adalat CC.*

 Miles next claims that Pfizer has distributed to its sales representatives a portion of the Miles FDA New Drug Application ("NDA") in an effort to disparage Adalat CC. Specifically, Miles argues that Pfizer's sales force is using notes written by a FDA statistical reviewer ("notes"), who, prior to Adalat CC's approval, expressed concerns that Adalat CC 30 mg is subtherapeutic.[33] Since Adalat CC 30 mg was thereafter unqualifiedly approved for once a day treatment for hypertension, the reviewer's earlier concerns have presumably been resolved to the FDA's satisfaction [34]. Therefore, use of the notes to suggest that the drug is somehow deficient is actionable as a literal falsity, contrary to the

30. *See* Hilleman Deposition, March 17, 1994. See also message from Tom Meador to Pratt district managers discussing the teleconferences, dated September 15, 1993, Exhibit 29 to Miles' Motion For Preliminary Injunction, April 22, 1994.

31. See Affidavit of Timothy Kidd, April 22, 1994.

32. Miles medical expert, William White, stated with regards to the Hilleman study that, "it is impossible to draw any meaningful conclusions from the results of this unblinded, uncontrolled survey in which the investigator has no face to face contact with the subjects." Affidavit of William White, Affidavits Submitted In Support of Miles Motion For a Preliminary Injunction, April 22, 1994.

33. The reviewer's notes specifically say, "The reduction in BP [blood pressure] is not statistically significantly greater for ATN + NIF 30 mg [Adalat CC 30 mg with a beta blocker] than placebo at week 6 ... Based on the week 6 results, study D88–033 shows that NIF 30 mg [Adalat CC] is marginally effective [ ... a blacked out passage follows], and this is supported by study D89–018 showing also a marginal efficacy [ ... another blacked out passage]. Thus, *both studies suggest that NIF 30 mg [Adalat CC] is a subtherapeutic* (emphasis added). Manogue Affidavit, Attachment 1, "Statistical Review and Evaluation", at 3. Affidavits Submitted in Support of Miles' Motion For Preliminary Injunction, April 22, 1994.

34. The FDA's approval letter for Adalat CC, dated April 21, 1993, states, "[w]e have completed the review of this application including the submitted draft labeling and have concluded that adequate information has been presented to demonstrate that the drug product is *safe and effective for use as recommended* in the submitted draft labeling." Accordingly, the application is approved. (emphasis added). Exhibit 14, Miles Motion For Preliminary Injunction, April 22, 1994.

FDA's governing statute,[35] and to applicable case law.[36]

Pfizer responds that its management has not distributed the notes for the purpose of sales and marketing. Rather, Pfizer claims that it has only distributed the notes to its Professional Services Department which performs a function independent from sales and marketing.[37] Furthermore, while Pfizer has not "distributed" the notes to its sales force, it has both "authorized" its sales representatives, and "directed" physicians, to contact the FDA in order to obtain the notes through the Freedom of Information Act. In this respect, Pfizer claims that Miles should not find this practice objectionable because the notes are a public document, and represent the formal conclusions of the FDA's epidemiology and statistics office. Since the findings of the notes were concurred in by the office's group leader and the office's chief of statistical evaluation after Miles' NDA was approved, *the FDA therefore did not deem Miles' NDA approval inconsistent* with the reviewer's characterization of Adalat CC 30 mg as "a subtherapeutic" (emphasis added). Further, Miles own efficacy studies allegedly suggest that Adalat CC is subtherapeutic at 30 mg.

It is not for this court to decide whether the FDA considers a drug characterized as "a subtherapeutic" to be nevertheless "effective." For purposes of the Lanham Act, the focus is not on what the FDA considers

either consistent or inconsistent, but on the message conveyed by the promotional material to the target audience. Notes which characterize a drug as "a subtherapeutic", and provide no additional information as to what "a subtherapeutic" means, are inconsistent with a conclusion that a drug is "effective."

The court finds that Pfizer management, through its Professional Services Department, has distributed the notes for the purpose of sales and marketing. In one example, the notes are attached to a letter written by Eugene Weiss of Pfizer's Professional Services Department to Gail Bormel, Assistant Director of Drug Control for the Massachusetts Department of Health. The letter reads,

> It is our understanding that on May 17 the Massachusetts State Board of Health Drug Formulary Committee will consider adding Adalat CC to the list of interchangeable drugs. In preparation for that meeting, we are submitting the enclosed package which includes: ... 1. A *letter with attachments from our Medical Department explaining our position on the scientific differences between Procardia XL and Adalat CC.*

The letter with attachments is from George Flouty, Director of Pfizer's Medical Department. It states,

> I am writing to you to outline some of the important differences that exist between

---

**35.** Miles asserts that pursuant to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321(n), drug advertising is misleading if it fails to reveal facts that are material. However, this statute does not govern the instant matter. This statute governs drug labeling, not drug advertisement. The FDA cannot regulate drug advertisements, it can only regulate literature which supplements a drug's package label and which is distributed to consumers as part of an integrated distribution plan and constitutes an essential supplement to the label attached to the package containing the drug. *McNeilab, Inc. v. HHS*, No. 84–1617, slip op. at 3. (D.D.C. June 5, 1985, citing *Kordel v. United States*, 335 U.S. 345, 349–50, 69 S.Ct. 106, 109–10, 93 L.Ed. 52 (1948) and *Alberty Food Products Co. v. United States*, 185 F.2d 321, 324–325 (9th Cir.1950)).

**36.** Miles cites *McNeilab, Inc. v. HHS*, No. 84–1617, *slip op.* (D.D.C. June 5, 1985), for the proposition that the FDA reviewer's conclusions

(Adalat CC 30 mg is "a subtherapeutic" or "marginally effective") are statements "made by [a] subordinate who does not necessarily speak for the agency." Id., slip op. at 6. However, *McNeilab, Inc.*, does not control the present case. In *McNeilab, Inc.*, FDA employees had conditioned FDA NDA approval on certain advertising restrictions, and the court found that these restrictions were not controlling in part because they were asserted by subordinate FDA employees. In the present case, the statements made by the subordinate FDA employee are conclusions reached from analysis pertaining to Adalat CC 30 mg's efficacy, they in no way relate to conditions of advertising. The FDA does not have authority to regulate print or televised advertisements. See *McNeilab, Inc.*, No. 84–1617 at 3 (D.D.C. June 1985).

**37.** *See* Declaration of Richard Reggio, June 29, 1994.

Procardia XL and Adalat CC. I believe it is critical for the Massachusetts State Board of Health Drug Formulary Committee to *consider this information when determining whether or not to add Adalat CC to the list of interchangeable drugs.* *Pfizer Letter, Eugene Weiss to Gail Bormel, April 26, 1994.* Miles' Exhibit 5 Submitted at Hearing, June 22, 1994. (emphasis added).

This letter with accompanying attachments including the notes plainly attempt to steer a drug formulary committee away from adding Adalat CC to its list of drugs which could be interchangeable with Procardia XL. If Adalat CC made the list of interchangeable drugs, then it would likely cut into sales of Procardia XL because Adalat CC carries a cheaper wholesale price. Therefore, Pfizer management, through its Professional Services Department, has distributed the notes for purposes of sales and marketing.

Further, prior to distribution of the letter, Flouty had testified that use of the notes in promotion of Procardia XL was discussed at Pfizer, with the conclusion that "there is no prohibition against using [the FDA statistical reviewer's notes]." [38] This statement, coupled with Pfizer's Professional Services Department's use of the notes, independently corroborate assertions made by Miles's sales representatives [39] that Pfizer's sales representatives are distributing the notes in promotion of Procardia XL.

A promotional statement is actionable under § 43(a) as a literal falsity if it is "untrue" as a result of a failure to disclose a material fact. *See Oil Heat Institute v. Northwest Gas,* 708 F.Supp. 1118, 1123 (D.Or.1988) (false for gas company advertisement to imply that maintenance for gas furnace requires a change of filters twice a year, when failing to disclose that additional routine maintenance would also be required). Further, a material fact is one which, if known to the purchaser, would likely influence the purchasing decision. *U.S. Healthcare, Inc. v. Blue Cross,* 898 F.2d 914, 921 (3d Cir.1990).

Generally, omissions which have been found to make a statement untrue concern a negative comparison with a competitor's product that omits information that would weaken a superiority claim. *See E.R. Squibb & Sons, Inc. v. Stuart Pharmaceutical,* Civ. No. 90–1178 (AET), 1990 WL 159909 1990 U.S.Dist. LEXIS 15788 (D.N.J. Oct. 1990); *American Home Products Corp v. Johnson and Johnson,* 654 F.Supp. 568, 580 (S.D.N.Y.1987).

In the present matter, the FDA reviewer's conclusion is not literally false, and his opinion is based upon reliable tests. However, the reviewer's comments do not constitute the end of the FDA's findings regarding Adalat CC 30 mg. The FDA's final conclusion was that Adalat CC, in all dosage strengths tested including the 30 mg version, is "effective", not "marginally effective", and not "a subtherapeutic". Further, because the omission of the FDA's final conclusion of Adalat CC as "effective" is likely to deter physicians seeking "effective" antihypertension treatment for their patients, the omission is material. Therefore, Pfizer's use of the FDA statistical reviewer's notes in the absence of disclosing material facts concerning the FDA's final disposition of Adalat CC 30 mg, is actionable under § 43(a) of the Lanham Act as a literal falsity.

### 5. *Pfizer's Promotional Materials*

Miles next asserts that Pfizer's promotional materials contain other statements which are literally false. These statements include representations that: 1) Adalat CC causes increased heart rate, but Procardia XL has no effect on heart rate; 2) Adalat CC causes peripheral edema of 20–30%, while Procardia XL causes peripheral edema of only 11%; and 3) Adalat CC 30 mg has no blood pressure lowering effect at 18 hours post dose.

The court finds that the evidence submitted is not sufficiently reliable to support the conclusion that documents containing these statements were distributed by any representative of Pfizer.

---

**38.** *George Flouty Deposition, March 25, 1994 at 54.*

**39.** See Affidavits of Stephen Manogue and Philip Martin, Affidavits Submitted in Support of Miles' Motion For Preliminary Injunction, April 22, 1994.

## B. MILES' ALLEGED "SCARE TACTICS" CLAIMS AGAINST PFIZER

Miles next asserts that Pfizer sales representatives are telling pharmacists and other health care workers that taking Adalat CC can cause patients to die or become ill. Specifically, Miles asserts that: 1) David Romeo, a Pratt (Pfizer) representative, told pharmacy assistant Clifton Owens that "if patients took Adalat CC at 7:00 am on a given morning, they would be dropping over dead (or words to that effect) by the following morning"[40]; and 2) that a Pfizer representative told a hospital pharmacy director that a local doctor had given Adalat CC to a patient who immediately fainted in the waiting room. Because the local doctor denies ever even prescribing Adalat CC, such statement is literally false.

Pfizer responds that Romeo's statements were not the alarmist "scare tactics" that Miles would like to portray. Moreover, studies in fact show that the plasma level of Adalat CC drops lower than the plasma level for Procardia XL toward the end of the respective dosing cycles. The end of this 24 hour dosing cycle is a time interval known to be associated with a high incidence of strokes and heart attacks.

In *Procter & Gamble Co. v. Chesebrough–Ponds, Inc.*, 747 F.2d 114 (2d Cir.1984), the court held that a Lanham Act plaintiff "bears the burden of showing that the challenged advertisement is false and misleading, not merely that it is unsubstantiated by acceptable tests or other proof." *Id.* at 119.

In the instant matter, Clifton Owens remembered his conversation with Pratt (Pfizer) representative David Romeo. Owens confirmed that in fact Romeo told him that "life threatening things could happen" to patients who use Adalat CC and that there were "some people who died in the morning" after taking Adalat CC.[41] Because Adalat CC has been FDA approved as "safe and effective" for 24 hour treatment of hypertension, Miles has established that Owens' statement regarding Adalat CC use and early morning death is literally false and actionable under the Lanham Act.

Finally, because Miles does not identify the Pfizer representative who allegedly told a hospital pharmacy director that a patient had fainted after taking Adalat CC, the court concludes that the affidavit evidence is not sufficiently reliable to support this claim.[42]

### Conclusion

Miles has demonstrated by a preponderance of the evidence a likelihood of success on the merits at trial that Pfizer has engaged in a campaign of disparaging Adalat CC through literal falsehoods and literally false establishment claims in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

A preliminary injunction is authorized where the plaintiff demonstrates both a likelihood of success on the merits of the underlying claim, and irreparable harm if relief is denied. *See Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992).

In the instant matter, Miles has demonstrated a likelihood of success on the merits of its underlying claim. In addition, because irreparable harm may be presumed where the plaintiff demonstrates a likelihood of success in showing literally false a comparative advertisement that mentions the plaintiff's product by name, *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir.1992), the court concludes that Miles has established irreparable harm. Therefore, having balanced and weighed the equities of the parties respective positions, the court grants Miles' motion for temporary injunction in part.

### ORDER

**IT IS ORDERED**, Pfizer, Inc., its successors and assigns, and its officers, agents, representatives, and employees, directly or

---

40. Affidavit of Jodell Andes, Affidavits Submitted In Support of Miles Motion For Preliminary Injunction, December 3, 1993.

41. *See* Owens Deposition Transcript at 77. Deposition Transcripts In Support of Miles Motion For Preliminary Injunction, April 22, 1994.

42. See Affidavit of Robert F. Marino, Affidavits Submitted In Support of Miles Motion for Preliminary Injunction, April 22, 1994.

through any corporation, subsidiary, division or other device, in connection with the promotion, offering for sale, sale, or distribution of "PROCARDIA XL", in or affecting commerce, do forthwith cease and desist from:

1. Using the Chung article in any promotional material which purports to describe the differences between Procardia XL and Adalat CC.

2. Using the FDA statisticians review of Adalat CC, entitled "Statistical Review and Evaluation", in the absence of an accompanying statement that the FDA has approved Adalat CC 30 mg as "safe and effective," in any promotional material or activity.

3. Using the Hilleman study to show either implicitly or explicitly that Procardia XL is milligram for milligram, stronger than Adalat CC, unless Pfizer or its representatives fully disclose a comprehensive description of the methodology by which Daniel Hilleman conducted the study.

4. Claiming, either explicitly or implicitly, that Adalat CC is not safe or effective *for 24 hour* treatment of hypertension.

5. Within 6 weeks of the date of this order, Pfizer must certify to this court that it has held training sessions with its sales representatives. All sales representatives must be made fully aware of the findings of this court in regards to Miles' counterclaim.

**IT IS ORDERED**, Pfizer, Inc., and Miles, Inc., their successors and assigns, and their officers, agents, representatives, and employees, directly or through any corporation, subsidiary, division or other device, in connection with the promotion, offering for sale, sale, or distribution of "PROCARDIA XL" or "ADALAT CC" in or affecting commerce, are enjoined from using any portion or the whole of this opinion in promotion of any commercial product in the United States of America.

It is so ordered.